UNITED STATES DISTRICT COURT                    ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

---

JIMMY JOSEPH,
                                    Plaintiff,          MEMORANDUM
                                                        AND ORDER
               - versus -                               12-CV-4402

BROOKLYN DEVELOPMENTAL
DISABILITIES SERVICES OFFICE,

                                    Defendant.

---

APPEARANCES :

          JIMMY JOSEPH
                    109-12 200th Street
                    St. Albans, NY  11412
                    Plaintiff, *Pro Se*

          ERIC T. SCHNEIDERMAN
                    Attorney General of the State of New York
                    120 Broadway, 24th Floor
                    New York, NY  10271
          By:     Adam J. Sansolo
                    *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

          Jimmy Joseph brings this *pro se* action against his employer, the New York State

Developmental Disabilities Services Office, located in Brooklyn ("Brooklyn DDSO"), under

Title VII of the Civil Rights Act, 42 U.S.C. § 2003 *et seq*.  Brooklyn DDSO moves to dismiss

Joseph's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

("Fed.R.Civ.P.") for failure to state a claim.  I heard oral argument on January 4, 2013.  For the

reasons stated below, Brooklyn DDSO's motion to dismiss is granted.  However, Joseph is

granted leave of 30 days to amend his complaint to the extent set forth below.

BACKGROUND

A.    *Factual Allegations*

            Joseph alleges the following facts, which I must accept as true for the purposes of

deciding this motion.[1]  *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

            Joseph is a black Haitian male.  Compl. Letter at 1.[2]  On September 23, 2010,

Joseph was hired as a housekeeping employee at the Brooklyn DDSO.  *Id.*

        1.   *Health Insurance and Overtime and Hazardous Pay*

            Upon his employment, Joseph signed up for health insurance.  *Id.*  However, he

did not receive his New York State Health Insurance Program card, indicating his enrollment in a

medical coverage plan, until early October 2012.  Joseph Aff. ¶ 7; Joseph Mem. in Support, Ex.

2.  Joseph complained to Brooklyn DDSO about his lack of coverage on several occasions but

"was told that they are processing the papers."  Compl. Letter at 1.

            Within a few months of being hired, Joseph informed his supervisor that he was

not receiving his overtime or hazardous pay.[3]  *Id.*  Joseph was "told that it was going to be taken

---

[1]        These factual allegations are set forth in Joseph's complaint and accompanying exhibits in addition to Joseph's opposition papers and his affidavit filed along with those papers.  Generally, a court may not look outside the pleadings when reviewing a Fed.R.Civ.P. 12(b)(6) motion to dismiss.  However, the mandate to read the pleadings of *pro se* litigants liberally warrants consideration of Joseph's additional materials, including his opposition papers and attachments thereto.  *See, e.g.*, *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (considering *pro se* plaintiff's affidavit submitted in opposition to defendants' motion to dismiss in reviewing district court's dismissal of claims); *Sommersett v. City of New York*, 09-CV-5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a pro se plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations.") (internal quotation marks omitted).
            Joseph also submitted an affidavit from Vayolah Larrieux, another employee of Brooklyn DDSO, along with his opposition papers.  Larrieux Aff. (ECF No. 16).  Where a party submits matters outside the pleadings (subject to the exception above) in response to a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a district court must either "exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material."  *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citation and internal quotation marks omitted).  I exclude this additional material, relying solely on the allegations set forth in Joseph's pleadings, opposition papers, and affidavit.
[2]        Joseph attached a letter to his complaint, which describes his allegations against Brooklyn DDSO in detail.

care of." *Id.* Joseph had "to go back and forth" and complain to others before he finally received this pay. *Id.* He found out that "other housekeeping employees received their hazardous pay before [him] without any problems." *Id.* One "Afro-American co-employee," Robert Glover, who began work at Brooklyn DDSO on the same date as Mr. Joseph, "received his payments without any delays." Joseph Aff. ¶ 5.

On November 17, 2011, Brooklyn DDSO approved Joseph's application for direct deposit, but never filed said application. *Id.* Joseph had to re-apply for direct deposit. *Id.* On December 16, 2011, Joseph discovered that Brooklyn DDSO had lost his pay check. *Id.* Joseph ended up receiving "a partial check in [the] form of petty cash in the amount of $504.37."[4] *Id.*; Joseph Mem. in Support, Ex. 1.

2. *Probation and Complaint to Deputy Director Jen Williamson*

Joseph was on "probation" from his date of employment, September 23, 2010, until September 22, 2011. Joseph Aff. ¶ 8. He received probationary reviews from his supervisors on December 23, 2010 and March 24, June 23 and September 8 of 2011, all of which described his performance as "satisfactory." *Id.*; Joseph Mem. in Support, Ex. 3.1-3.4. Two of Joseph's other supervisors described Joseph as a "modeled [sic] employee" during this period. Joseph Aff. ¶ 8. Joseph's probationary reviews caused Joseph "mental anguish" because he felt he was "overworked, underpaid, mistreated, looked down at, spied on, segregated, and always utilized for the most tedious tasks." *Id.*

---

[3]  These allegations are in tension with Joseph's allegation that he "was always denied" the opportunity to work "[d]uring snow storms or natural disasters and state emergencies," which "were the only time[s] that the housekeeping department could mandate overtime." Joseph Aff. ¶ 6. Joseph cites December 26, 2010, February 2, 2011, and August 28, 2011 as examples of dates when he was denied the opportunity to work overtime. *Id.*

[4]  Joseph includes these factual allegations in his discussion of failing to receive overtime or hazardous pay, although they seem to affect his general receipt of compensation.

While on probation, Joseph witnessed other individuals, who were hired contemporaneously, such as Glover, pass probation prior to him.  Compl. Letter at 1; Joseph Aff. ¶ 8.  He also witnessed those who were hired after him, such as Mr. Harris, who was hired in November 2010, pass probation prior to him.[5]  Joseph Aff. ¶ 8.

At oral argument, Joseph represented that all new employees must go through a year of probation and receive four quarterly reports.  Brooklyn DDSO could not confirm whether Joseph had accurately represented its probation policy.  It stated that it was possible that some employees could pass probation earlier than others.

In early November 2011, after Joseph had passed his probation, he complained to Deputy Director Jen Williamson, informing her of "all the atrocities such as hostile work environment [he] had experienced."  *Id*.  Williamson informed Joseph that she could not help him because he was "an angry individual."  *Id*.; Compl. Letter at 1.

### 3.  *Physical Therapy Position*

From November 28, 2011 to December 15, 2011, Joseph was trained by the physical therapy department staff so that he might "become an apprentice to [the] adaptive equipment specialist in [the] physical therapy department."  Joseph Aff. ¶ 10.  The Director of Personnel "learned of such activities" and "closed the opening by outsourcing the majority of the duties to a third party."[6]  *Id*.  Had Joseph been able to obtain the apprenticeship, his salary would have increased from "a grade five to a grade fourteen."  *Id*.

### 4.  *Threats and Attack by John Gilbert*

In November 2010 Joseph began working at Building #2.  Compl. Letter at 1.  While working in Building #2, Joseph was verbally threatened by John Gilbert, another

---

[5]    Joseph does not provide Mr. Harris's full name.
[6]    Joseph does not provide the name of the Brooklyn DDSO Director of Personnel.

housekeeping employee. *Id*. Gilbert told Joseph that he was "going to slap the hell out of [Joseph]." *Id*. Joseph felt his safety was at risk and filed a workplace violence complaint on April 21, 2011. *Id*.; Brooklyn DDSO Mem. add.[7] Joseph's supervisors "handled the situation as if [he] wasn't a victim" and informed him that "[he] probably was the one that said something to the guy." Compl. Letter at 1. After filing the workplace violence complaint, Joseph lodged additional complaints with his supervisor, Deputy Director Williamson, and various administrators regarding "the magnitude of hate, injustice, and unfair practices" to which he was being subjected. Joseph Aff. ¶ 9.

Following this incident, Joseph was transferred to Building #1.[8] Compl. Letter at 1. Gilbert continued to threaten Joseph, even after his transfer. *Id*. Joseph's supervisors were aware that these threats continued. *Id*.

On December 22, 2011 at 7:30 AM Joseph was attacked by Gilbert. *Id*. As Joseph was "setting up for work," Gilbert "unexpectedly hit [him] harshly in [the] lower back with a heavy commercial dryer several times." *Id*. Joseph reported the incident to his supervisors. *Id*. at 2. He filed a workplace violence complaint on the day of the incident. *Id*.; ECF No. 1 at 11.[9] He also filed an employee workplace incident complaint.[10] Compl. Letter at

---

[7]     Brooklyn DDSO attached as an addendum to its Memorandum of Law a copy of this workplace violence complaint. On a motion to dismiss, a court may consider "the facts and allegations that are contained in the complaint" as well as "in any documents that are . . . incorporated into the complaint by reference." *Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

[8]     At oral argument, Joseph clarified that he was transferred to Building #1 sometime in April 2011.

[9]     Joseph attached to his complaint a copy of this workplace violence complaint, in addition to other documentation. These attachments are not numbered; for ease of reference, I will cite to each piece of documentation by its ECF page number.

[10]     Joseph did not provide a copy of this complaint. In his opposition papers, Joseph also alleges that he filed a complaint with the New York State Inspector General regarding the alleged assault by Gilbert. Joseph Mem. in Opp. at 4-5. He did not provide the date of said complaint.

1-2.  Brooklyn DDSO did not respond to Joseph's complaints; Joseph "was left in the same place and [Gilbert] was still going around the facility as if he owned the place."[11]  *Id.* at 2.

> 5. *Termination of Workers' Compensation Benefits*

As a result of the alleged attack by Gilbert, Joseph was absent from work for a week but returned because he "could not afford to stay out any longer."  *Id.*  A few weeks later, Joseph's "workers compensation doctor put [him] out due to the MRI results."  *Id.*  Joseph began "going to therapy three times a week as per doctor's order."  Compl. Letter at 2.  Joseph's workers' compensation benefits were approved and he received his first check.  *Id.*; Joseph Mem. in Support, Ex. 7.3.[12]

On March 2, 2012, Joseph received a letter from the Workers' Compensation Board stating that Brooklyn DDSO had reported that Joseph had returned to work.  Compl. Letter at 2.  But Joseph had not returned to work; he was still "out on disability" at that time.  *Id.*  Joseph's workers' compensation benefits were subsequently terminated.  *Id.* at 2.[13]

A week later, Brooklyn DDSO called Joseph in and informed him that he "was the first one to let go for layoff" based on his lack of seniority.  *Id.*  At oral argument, Joseph clarified that Brooklyn DDSO did not lay him off at this time, but informed him that he was pending lay-off; Joseph remains currently employed by Brooklyn DDSO.[14]

---

[11]     At oral argument, Brooklyn DDSO stated that Gilbert is currently on leave due to the December 22, 2011 incident with Joseph as well as another unspecified incident.

[12]     This exhibit is a copy of Joseph's workers' compensation benefits summary.  According to this summary, Joseph received a week of benefits from December 25, 2011 to January 2, 2012, immediately following the alleged attack by Gilbert.  Joseph received another three weeks of benefits from February 10, 2012 to March 2, 2012.

[13]     Joseph's workers' compensation benefits summary states that on March 2, 2012, payments were "suspended" because "[c]laimant returned to work at full pay," and also that payments were "stopped" due to the State Insurance Fund's "medical consultant's report of no disability."  Joseph Mem. in Support, Ex. 7.3.

[14]     Joseph also presented a letter to the court, during oral argument, dated December 27, 2012.  ECF No. 19.  The letter is from Brooklyn DDSO to Joseph and informs Joseph that he "will have been out of work for one year on January 21, 2013" and that his "employment will terminate . . . due to completion of one cumulative year of absence."  *Id.*  It notifies Joseph that he has "the right to apply to this office prior to that date for restoration to duty if [he is] medically fit to perform the duties of [his] position."  *Id.*  Joseph informed the court that he would

On March 30, 2012, Brooklyn DDSO sent a letter to Joseph, which stated that Joseph had been out on Occupational Injury leave since January 29, 2012.  ECF No. 1 at 15.[15] The letter further stated that Joseph had failed to submit "any documentation to cover [his] absence;" it informed Joseph that employees on Occupation Injury leave are required to submit "monthly medical notes to the Personnel Office."  *Id*.  Finally, it warned Joseph that if he did not submit the required medical documentation, he would be "removed from Workers' Compensation Leave" and placed on Unauthorized Leave.  *Id*.

Joseph filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") on June 25, 2012.  Compl. at 4.  On July 12, 2012, the EEOC issued Joseph a right to sue letter.  *Id*. at 5.

B.      *Procedural History*

Joseph filed the complaint in this case on August 29, 2012.  Compl. (ECF No. 1). The complaint suggests that he purports to raise three distinct claims under Title VII: (1) discrimination on the basis of race, gender, and national origin; (2) retaliation; and (3) hostile work environment.  Brooklyn DDSO filed a motion to dismiss Joseph's complaint on November 29, 2012.  Brooklyn DDSO Mot. Dismiss (ECF No. 11); *see also* Brooklyn DDSO Mem. in Support (ECF No. 12).  I heard oral argument on the motion on January 4, 2013.

DISCUSSION

A.      *The Standard of Review*

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-

---

not be medically fit by January 21, 2013 and that he was currently waiting for workers' compensation to pay for back surgery.
[15]     Joseph attached a copy of this letter to his complaint.

56 (2007).  However, a court need not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  If a party does not "nudge[] [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

District courts are required to read *pro se* complaints liberally; "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  The court must therefore interpret the complaint "to raise the strongest arguments that it suggests." *Chavis v. Chappuis*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Harris v. City of N.Y.*, 607 F.3d 18, 24 (2d Cir. 2010)) (internal quotation marks omitted).  This canon holds especially true where the *pro se* plaintiff asserts civil rights violations.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).  Nevertheless, a *pro se* plaintiff must still comply with the relevant rules of procedural and substantive law, *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983), including pleading "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995) ("Although *pro se* litigants should be afforded latitude, they generally are required to inform themselves regarding procedural rules and to comply with them.").

B.      *Joseph's Discrimination and Retaliation Claims*

1.      *The Timeliness of Joseph's Discrimination and Retaliation Claims*

Before filing a Title VII claim, a plaintiff must first exhaust his or her

administrative remedies.  42 U.S.C. § 2000e-5(e); *see also Francis v. City of New York*, 235 F.3d

763, 768 (2d Cir. 2000) (holding that exhaustion is not a jurisdictional prerequisite but an

"essential" precondition to bringing a Title VII claim in federal court).  Exhaustion ordinarily

requires a plaintiff to timely file a charge with the EEOC within 180 days of the "alleged

unlawful employment practice."  42 U.S.C. § 2000e-5(e)(1).  But if the employment practice

took place in a state or locality with its own antidiscrimination laws and an agency to enforce

those laws, "an employee who initially files a grievance with that agency" has 300 days to file a

charge with the EEOC.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002);

*Ford v. Bernard Fineson Development Center*, 81 F.3d 304, 307 & n.6 (2d Cir. 1996); 42 U.S.C.

§ 2000e-5(e)(1).

New York has antidiscrimination laws and antidiscrimination agencies at the state

and local level; the 300-day limit therefore applies to plaintiffs who initially file a grievance with

a state or local agency.  *See Ford*, 81 F.3d at 307.  Here, Joseph did not initially file a grievance

with a state or local agency.  Compl. at 4.  Rather, he proceeded directly to file a charge with the

EEOC on June 25, 2012.  *Id*.  But because Brooklyn DDSO states that the 300-day period

applies, I accept this time limit rather than the 180-day limitation.  Brooklyn DDSO Mem. at 5-6;

*see Deravin v. Kerik*, No. 00-CV-7487, at *4 n.10 (S.D.N.Y. April 2, 2007) ("Neither party

contends that Plaintiff filed charges with a state or local agency before filing it with the EEOC . .

. .  Because, however, Defendants state that the 300-day limitation applies, the Court accepts that

time limit rather than Title VII's 180-day limitation.") (citing *Van Zant v. KLM Royal Dutch*

*Airlines*, 80 F.3d 708, 713 n.1 (2d Cir. 1996) ("We find no reference in the record to Van Zant

having filed her charge with a state or local equal employment agency before filing with the

EEOC.  However, since the parties agree that the 300-day period applies in this case, we will

accept this as a stipulated fact.")).

   Brooklyn DDSO argues that Joseph has asserted claims that accrued prior to

August 30, 2011 and that those claims are time-barred because they occurred more than 300 days

before he filed his complaint with the EEOC on June 25, 2012.  *See* Brooklyn DDSO Mem. at 5-

6.  In particular, Brooklyn DDSO argues that the following claims must be dismissed for failure

to file a timely administrative complaint: (1) Joseph's failure to receive health insurance; (2)

Joseph's failure to receive overtime and hazardous pay; (3) Joseph's transfer to Building #2 in

November 2010; (4) Joseph's subsequent transfer to Building #1 in April 2011;[16] and (5) the

mishandling of Joseph's workplace violence complaint in April 2011.  *Id.* at 6.

   Incidents of employment discrimination or retaliation must be categorized as

discrete acts or continuing violations for timeliness purposes.  *Morgan*, 536 U.S. at 114-15.  The

Supreme Court has explained that the Title VII statutory term "'employment practice' generally

refers to a discrete act or single occurrence that takes place at a particular point in time."

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 628 (2007) (quoting *Morgan*, 536

U.S. at 110-11).  This interpretation of "practice" holds true even when the discrete act or single

occurrence "has a connection to other acts."  *Morgan*, 550 U.S. at 111; *see also Elmenayer v.*

*ABF Freight System, Inc.*, 318 F.3d 130, 134 (2d Cir. 2003) ("[A]n employer performs a separate

---

[16]   What Brooklyn DDSO refers to as Joseph's "transfer" to Building #2 in November 2010 and
subsequent "transfer" to Building #1 does not adequately capture those particular claims as articulated by Joseph.
Joseph does not allege that the "transfers" themselves constituted unlawful employment practices.  Rather, Joseph
alleges that following his transfer to Building #2, he was verbally threatened by Gilbert and that Brooklyn DDSO
did not adequately respond to his complaints about Gilbert's behavior.  Compl. Letter at 1.  Following Joseph's
complaints regarding Gilbert's threat, he was transferred to Building #1, where he alleges that Gilbert continued to
verbally threaten him.  *Id.*  Joseph alleges that his supervisors were aware that these threats continued, but did
nothing.  *Id.*

employment practice each time it takes adverse action against an employee, even if that action is simply a periodic implementation of an adverse decision previously made.").  Each discrete discriminatory or retaliatory act "constitutes a separate actionable 'unlawful employment practice'" and cannot "make timely acts that fall outside the time period."  *Id*. at 112, 114.

The continuing violation doctrine serves as an exception to this rule; "[i]f a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred."  *Van Zant*, 80 F.3d at 713; *Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) ("Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.").  The continuing violation doctrine ordinarily applies "when there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests."  *Van Zant*, 80 F.3d at 713; *cf. Lambert*, 10 F.3d at 53 ("[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.").  But "'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice,' a continuing violation may be found."  *Van Zant*, 80 F.3d at 713 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).

Joseph does not allege that Brooklyn DDSO engaged in an "ongoing discriminatory policy or practice" with respect to the claims that Brooklyn DDSO challenges as

time-barred.  Nor does he allege any facts that suggest evidence of such a policy or practice (*e.g.*, a biased seniority system or employment test) or of specific, related incidents of discrimination that Brooklyn DDSO left unremedied over a long period of time.  Rather, his allegations against Brooklyn DDSO amount to discrete acts of alleged discrimination and retaliation – the denial of health insurance, the denial of overtime and hazardous pay, and the failure to respond to complaints about Gilbert's menacing behavior towards Joseph.

A discrete discriminatory or retaliatory act "takes place at a particular point in time." *Ledbetter*, 550 U.S. at 628.  Specifically, each discrete act "'occurred' on the day that it 'happened.'" *Morgan*, 536 U.S. at 110.  Subsequent "effects alone cannot breathe life into prior, uncharged [acts]; . . . such effects in themselves have 'no present legal consequences.'" *Ledbetter*, 550 U.S. at 628 (quoting *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977)).  A plaintiff, therefore, "must file a charge within [the limitations period] of the date of the act or lose the ability to recover for it." *Morgan*, 536 U.S. at 110.

With respect to Joseph's claim that Brooklyn DDSO failed to respond to his complaints regarding Gilbert's verbal threats, Brooklyn DDSO's decision(s) not to respond are the operative moments when the alleged discriminatory or retaliatory act "occurred" or "happened." Joseph alleges that Gilbert first threatened him in Building #2 in April 2011. Compl. Letter at 1.  He subsequently filed a workplace violence complaint on April 21, 2011, *id.*; after filing the complaint, he lodged additional complaints with various Brooklyn DDSO administrators.  Joseph Aff. ¶ 9.  While Joseph does not allege specific dates when Brooklyn DDSO made the decision not to respond to these complaints, his papers suggest that these decisions occurred shortly after he made his various complaints.  Compl. Letter at 1.

Accordingly, Joseph's claim arising from Brooklyn DDSO's failure to respond to his complaints regarding Gilbert's verbal threat in April 2011 is time-barred.

Joseph also alleges that Gilbert continued to threaten him following his transfer to Building #1 and that his supervisors were aware of these continued threats but did nothing. *Id*. However, Joseph does not allege that he lodged additional complaints regarding Gilbert's continued threats. Nor does he separately allege specific dates when Brooklyn DDSO became aware of these threats and made the decision not to respond. Accordingly, I cannot make out whether any such decision occurred prior to or after August 30, 2011. Joseph may be able to remedy this defect by providing more factual detail. Joseph is therefore granted leave to replead his claim arising from Brooklyn DDSO's failure to respond to Gilbert's threats towards Joseph in Building #1.

With respect to Joseph's claim that he was denied health insurance, Brooklyn DDSO's decision(s) to deny Joseph health insurance are the operative moments when the alleged discriminatory or retaliatory act "occurred" or "happened." Joseph alleges that he was denied health insurance from the start of his employment in September 2010 until October 2012. Compl. Letter at 1. However, he fails to identify any specific dates when Brooklyn DDSO made the decision to deny him health insurance. And while he alleges that he complained to Brooklyn DDSO about his lack of coverage on several occasions, he fails to identify specific dates for these complaints, which would have presumably preceded Brooklyn DDSO's decisions to deny him health insurance. *Id*. Accordingly, I cannot make out whether any of these decision(s) occurred prior to or after August 30, 2011. Again, Joseph may be able to remedy this defect by providing more factual detail. Joseph is therefore granted leave to replead his claim arising from Brooklyn DDSO's denial of his health insurance.

Joseph's claim that he was denied overtime and hazardous pay suffers from a similar deficiency.  Joseph alleges that he was denied overtime and hazardous pay for some unspecified time.  *Id*.  But he fails to identify any specific dates when Brooklyn DDSO made the decision to deny him this compensation.  *Id*.  And while he also alleges that he lodged complaints on multiple occasions, he fails to identify any specific dates when he made such complaints.  *Id*.  Accordingly, I cannot make out whether Brooklyn DDSO's decision(s) to deny Joseph overtime and hazardous pay occurred prior to or after August 30, 2011.  Joseph may be able to remedy this defect by providing more factual detail.  He is therefore granted leave to replead his claim arising from Brooklyn DDSO's denial of his overtime and hazardous pay.[17]

2.     *The Sufficiency of Joseph's Timely Discrimination and Retaliation Claims*

Joseph's timely discrimination and retaliation claims are as follows:  Brooklyn DDSO failed to file Joseph's direct deposit application in November 2011; Brooklyn DDSO lost his pay check in December 2011; Brooklyn DDSO permitted other employees, who were hired contemporaneously with or after Joseph, to pass probation before him; Brooklyn DDSO obstructed Joseph's promotion to an apprenticeship in the physical therapy department; Brooklyn DDSO failed to respond to Joseph's complaints regarding the December 22, 2011 attack by Gilbert; Brooklyn DDSO falsely informed the Workers' Compensation Board that Joseph had returned to work when he remained on disability leave; and Brooklyn DDSO is preparing to lay Joseph off based on lack of seniority while retaining other employees with less seniority than Joseph.

---

[17]     Joseph is further admonished to provide greater factual detail supporting an inference of discrimination and retaliation, in light of the discussion that follow of the sufficiency of his timely discrimination and retaliation claims.

a.  *Discrimination*

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e–2(a)(l).  To establish a claim of discrimination under Title VII, a plaintiff must demonstrate that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002)).  On a motion to dismiss, a plaintiff need not plead all the facts necessary to establish a prima facie case, but must satisfy Fed.R.Civ.P. 8 by making "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) (quoting Fed. R. Civ. P. 8(a)(2)); *see also Twombly*, 550 U.S. at 547 (explicitly affirming the *Swierkiewicz* pleading standard for employment discrimination cases).

Brooklyn DDSO does not dispute that Taylor belongs to a protected class, is qualified for his position, or suffered adverse employment actions.  Rather, it contends that Joseph did not suffer such actions under circumstances giving rise to an inference of discriminatory intent.  Brooklyn DDSO Mem. at 6-8.

An inference of discriminatory intent "may be derived from a variety of circumstances, including, but not limited to: . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group . . . ."  *Leibowitz v. Cornell University*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal citations

omitted)).  None of Joseph's allegations raise a plausible inference that Brooklyn DDSO's

alleged adverse employment actions – failing to file Joseph's direct deposit application; losing

his pay check; permitting other employees to pass probation prior to Joseph; obstructing his

promotion to an apprenticeship; failing to respond to his complaints regarding Gilbert's attack;

falsely informing the Workers' Compensation Board that he had returned to work; preparing to

lay Joseph off prior to other employees – were the result of discrimination on the basis of his

race, gender, or national origin.  Joseph makes no allegation that Brooklyn DDSO ever criticized

him in "ethnically degrading terms," or made "invidious comments" about his race, gender, or

Haitian nationality.

   The complaint further lacks sufficient allegations regarding "more favorable

treatment of employees not in the protected group."  Joseph alludes a few times to different

treatment afforded his "Afro-American co-employees."  Joseph Aff. ¶¶ 8-9.  These allusions

lacked specificity; for example, Joseph alleges at one point that "no one not me (Plaintiff) nor

my Afro-American co-employees should be subjected to such hostile work environment where I

had to work isolated, restricted, and always called on for the lesser tasks."  *Id.* ¶ 9.  And when

pressed at oral argument to articulate facts that would give rise to the inference of discriminatory

intent, Joseph reiterated that other "Afro-American" employees received more preferable

treatment, but did not elaborate further.  While Joseph suggests, therefore, that Brooklyn DDSO

discriminated against him on the basis of his Haitian nationality, he does not allege sufficient

facts to raise Joseph's right to relief on the basis of discrimination "above the speculative level."

*Twombly*, 550 U.S. at 555.

Because Joseph may be able to remedy these defects by providing more factual detail, he is granted leave to replead with respect to his timely claims of discrimination on the basis of national origin.[18]

      b.    *Retaliation*

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, an employee must demonstrate that (1) he participated in a protected activity known to defendant; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  *See Terry*, 336 F.3d at 141 (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).  As with a discrimination claim, a plaintiff is not required to plead facts sufficient to establish a prima facie case of Title VII retaliation in order to survive a motion to dismiss.  *See Williams v. New York City Housing Authority*, 458 F.3d 67, 72 (2d Cir. 2006) ("The *Swierkiewicz* holding applies with equal force to . . . retaliation claims . . . .").  Rather, "the ordinary rules for assessing the sufficiency of a complaint apply."  *Swierkiewicz*, 534 U.S. at 511.

Brooklyn DDSO contends that Joseph has failed to identify "what protected activity inspired the retaliation."  Brooklyn DDSO Mem. at 9.  It further argues that even if the court were to construe Joseph's complaints to Deputy Director Williamson in November 2011

---

[18]    Joseph may not include in his amended complaint claims of discrimination on the basis of race or gender.  Nothing in Joseph's papers raises even the suggestion that Brooklyn DDSO discriminated against him on the basis of these protected characteristics.  And at oral argument, Joseph emphasized only that he was treated differently from "African-Americans," but not from employees of a different race or gender.

and complaints about Gilbert's attack in December 2011 as the activity resulting in retaliation, they are not "protected," because they do not address discrimination in the workplace. *Id.* at 9-10. Finally, Brooklyn DDSO argues that even if the court were to construe these complaints as "protected activity," Joseph has failed to plausibly allege a causal connection between this protected activity and an adverse employment action.

The Second Circuit defines "protected activity" as "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). While Joseph does not specifically identify the protected activity that led to the alleged retaliation by Brooklyn DDSO, he alleges several timely complaints taken to protest his treatment at work. In particular, he alleges that he made a complaint to Deputy Director Williamson after passing probation in November 2011 and filed workplace violence and employee incident complaints in December 2011 following the alleged attack by Gilbert.

Joseph does not plausibly allege that he engaged in protected activity when he complained to Williamson. He simply alleges that when he passed his probation, he complained to Williamson "to inform her of all the atrocities such as [the] hostile work environment." Joseph Aff. ¶ 9. What specific atrocities Joseph was referring to is unclear. Even if the court were to infer that Joseph was addressing his working conditions in Building #1, those alleged conditions – namely, continued threats from Gilbert that went unaddressed by Brooklyn DDSO – do not, on their own, plausibly suggest a complaint by Joseph that Brooklyn DDSO engaged in discriminatory action.

Similarly, Joseph does not plausibly allege that he engaged in protected activity when he filed workplace violence and employee incident complaints in December 2011. He merely alleges that he filed these complaints in response to Gilbert's attack for the purpose of

"report[ing] the incident."  Compl. Letter at 1-2.  Moreover, the very content of the workplace violence complaint, which Joseph attached to his complaint, makes no suggestion that Joseph was complaining to protest discrimination in the workplace.  ECF No. 1 at 13.  Rather, it focuses narrowly on the details of Gilbert's attack of Joseph.  *Id.*

Joseph may also be able to remedy these defects by providing greater factual detail.  Accordingly, Joseph is granted leave to replead with respect to his claims of retaliation arising from his complaint to Deputy Director Williamson in November 2011 and the workplace violence and employee incident complaints filed in December 2011.  At oral argument, Joseph also stated that he filed additional complaints, including to his union, regarding his treatment at Brooklyn DDSO.  He failed, however, to provide additional details, such as the content of these complaints and the dates when they were filed.  In this respect as well, Joseph is accordingly granted leave to replead with respect to claims of retaliation arising from additional protected activity occurring after August 30, 2011.

C.    *Joseph's Hostile Work Environment Claim*

1.    *The Timeliness of Joseph's Hostile Work Environment Claim*

The Supreme Court has instructed that hostile work environment claims "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." *Morgan*, 536 U.S. at 115.  The "unlawful employment practice" at issue in hostile work environment claims "cannot be said to occur on any particular day" but "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Id.*  Accordingly, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment

takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 105).

Here, Joseph filed a charge with the EEOC within 300 days of at least one alleged act contributing to a hostile work environment. Joseph alleges that Gilbert physically attacked him on December 22, 2011 and that Brooklyn DDSO failed to respond to his complaints about the incident. Compl. Letter at 1-2. Accordingly, I may consider "the entire scope" of Joseph's hostile work environment claim, including any allegedly discriminatory behavior by Brooklyn DDSO that occurred prior to August 30, 2011.

### 2. *The Sufficiency of Joseph's Hostile Work Environment Claim*

Title VII also prohibits "a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). To establish a prima facie claim for hostile work environment, the plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* (citations and internal quotation marks omitted). A court must look at "all the circumstances," including "the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The conduct must be both objectively and subjectively hostile. *Id.* at 21-22. Again, a plaintiff is not required to plead facts sufficient to establish a prima facie case of hostile work environment under Title VII in order to survive a motion to dismiss, "so long as they provide in the complaint a short and plain statement of the claim that plaintiffs are entitled to relief and that gives the defendant fair notice of plaintiffs' claim for hostile work environment and the grounds

upon which that claim rests." *See Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007).

As discussed in my analysis of Joseph's Title VII discrimination claim, Joseph fails to plausibly allege that Brooklyn DDSO engaged in discriminatory conduct.  Joseph's hostile environment claim falters for the same reason.  His papers do not raise the plausible inference that any of the alleged "intimidation, ridicule, and insult" that he was subjected to was related to his race, gender, or national origin.  Accordingly, Joseph fails to state a claim that the work environment at Brooklyn DDSO was so "permeated with *discriminatory* intimidation, ridicule, and insult" so as to alter the conditions of his employment.  *See Harris*, 510 U.S. at 21 (emphasis added).

As with Joseph's discrimination and retaliation claims, he may, if he wishes, attempt to replead his hostile work environment claim in an amended complaint.

## CONCLUSION

Joseph's factual allegations do not assert a claim under Title VII.  Accordingly, he is given 30 days' leave to replead with greater factual allegations to support his claims.  Joseph may not include in his amended complaint Title VII claims on the basis of race or gender and he may not include claims that have been dismissed as time-barred.  Joseph's amended complaint must be captioned as an "Amended Complaint" and bear the same docket number as this order. Joseph is advised that any amended complaint he files will completely replace the original complaint.  The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose

of any appeal.  *Coppedge v. United States*, 369 U.S. 438, 444, 45 (1962).


So ordered.


John Gleeson, U.S.D.J.


Dated: January 15, 2013
      Brooklyn, New York