UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

JIMMY JOSEPH,

                   Plaintiff,

         - against -

BROOKLYN DEVELOPMENTAL
DISABILITIES SERVICES OFFICE,

                   Defendant.

-------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
12-CV-4402 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Jimmy Joseph ("Plaintiff" or "Joseph") has brought this employment discrimination action against his former employer, Defendant Brooklyn Developmental Disabilities Services Office ("Defendant" or "BDDSO"). Plaintiff alleges that, on the basis of his Haitian national origin, Defendant subjected him to a hostile work environment and discrimination in the terms, conditions, and privileges of his employment as a housekeeping employee, retaliated against him for complaining about this conduct, and failed to promote him, in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.* More specifically, Plaintiff claims that Defendant treated him less favorably than similarly situated African-American employees of Defendant.

       Defendant now moves for summary judgment, seeking the dismissal of all claims in this action. For the reasons stated below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND

I.      Factual Background

     A.      General Information

Defendant is a state-operated facility that provides housing and services to individuals with developmental disabilities in the Brooklyn area. (Def. 56.1[1] ¶ 2.) Beginning on September

---

[1] Citations to "Def. 56.1." refer to Defendant's Local Rule 56.1 Statement of Material Facts in support of its motion for summary judgment. (Dkt. 95.) Citations to "Pl. Opp. 56.1" refer to Plaintiff's Local Rule 56.1 Statement in opposition to Defendant's motion for summary judgment. (Dkts. 89, 90 (identical).) Where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d) ("56.1 Statement"). Thus, unless otherwise stated, a standalone citation to a 56.1 Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein.

The Court notes with some frustration the disorganized and incoherent nature of the materials Plaintiff has submitted in opposition to summary judgment. For example, as noted above, Plaintiff submitted two identical 56.1 Statements in opposition to Defendant's motion, both of which make repeated reference to various exhibits but only one of which actually attaches any supporting materials. (*Compare* Dkt. 89 (no attachments), *with* Dkt. 90 (attachments).) Nowhere in these 56.1 Statements, or anywhere else in Plaintiff's papers, are these exhibits enumerated, nor is there any declaration submitting them for the Court's consideration and attesting to their accuracy.

Nevertheless, the Court has reviewed the materials attached to the second of Plaintiff's 56.1 statements (Dkt. 90). *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."). The Court has interpreted Plaintiff's citations therein as follows: Plaintiff Exhibit A is a collection of excerpts from Plaintiff's own deposition (Dkts. 90-1–90-4 ("Joseph Dep.")); Plaintiff Exhibit B is the Affidavit of Cheryl McClain (Dkt. 90-5 ("McClain Aff.")); Plaintiff Exhibit C is the Affidavit of Vayolah Larrieux (Dkt. 90-6 ("Larrieux Aff.")); Plaintiff Exhibit D is a miniscript version of Larrieux's March 27, 2015 deposition (Dkt. 90-7 ("Larrieux Dep.")); Plaintiff Exhibit E is a miniscript version of McClain's March 20, 2015 deposition (Dkt. 90-8 ("McClain Dep.")); Plaintiff Exhibit F is a copy of Plaintiff's Second Amended Complaint ("SAC") in this action (Dkt. 90-9); and Plaintiff Exhibit G is a copy of Plaintiff's Response to Defendant's Interrogatories (Dkt. 90-10) ("Rog. Resp.").

In addition to Plaintiff Exhibit A, excerpts from Plaintiff's deposition are also attached as Exhibit A to the Declaration of Adam J. Sansolo ("Sansolo Decl.") in support of Defendant's motion for summary judgment. (Dkt. 108.)

23, 2010, Plaintiff was employed by Defendant as a part-time housekeeping employee. (*Id.* ¶¶ 1, 3.) Plaintiffs' supervisors during his employment by Defendant were Housekeeping Supervisors Dipmarine Saroop[2] and James Norman, as well as Director of Housekeeping Shawn Nabors. (*Id.* ¶ 4.) Both Norman and Nabors attended Plaintiff's initial employment interview and recommended hiring him to be a cleaner in the Housekeeping unit (*id.* ¶ 11), though Plaintiff claims they only discovered Plaintiff's Haitian national origin several months later, on November 29, 2010, when he was "talking Haitian[3] to his cousin" (Pl. Opp. 56.1 ¶ 11).

B.    Probationary Period

Every cleaner hired by Defendant's Housekeeping department had to complete a one-year probationary period. If an employee's work was found to be unsatisfactory at the end of the probationary period, the period could either be continued or his/her employment could be terminated. (Def. 56.1 ¶ 15.) According to Defendant, Plaintiff served a probationary period lasting one year—from his start date of September 23, 2010 until September 23, 2011—during which he received four probationary reports reflecting his work progress. (*Id.* ¶¶ 16–17.) Plaintiff admits that, on paper, he passed probation within one year, but alleges that Nabors and other

---

[2] Plaintiff testified throughout his deposition regarding a supervisor referred to as "Ceruck." (*See, e.g.*, Joseph Dep. at 25:6–9 (Plaintiff lists his supervisors as "Shawn Nabors, James Norman and Ceruck").) But Plaintiff does not dispute that, other than Nabors and Norman, his third supervisor was Dipmarine Saroop. (Def. 56.1 ¶ 4; Pl. Opp. 56.1 ¶ 4*; see also* Joseph Dep. at 91:21–25 (asking Plaintiff whether "Ceruck's" "first name" is "Ditman (phonetic)") (incomplete question/answer excerpt).) The Court therefore presumes that "Ceruck" is a misspelling or an error in the transcription of Saroop's name. (*Cf.* Larrieux Aff. ¶ 5 (listing "Jimmy's [Plaintiff's] supervisors" as "Saroop, Nabors and Norman"); Larrieux Dep. at 47:23–48:8 (testifying regarding discriminatory comments Larrieux allegedly overheard, including by "Saroop, who was a supervisor too [and] James Norman [who] was a supervisor, too").)

[3] The Court presumes that Plaintiff refers to Creole, as "Haitian" is not a language. *See* The World Factbook 2013–14—Field Listing: Languages. Washington, DC: Central Intelligence Agency, 2013, https://www.cia.gov/library/publications/the-world-factbook/fields/2098.html (listing French and Creole as Haiti's official languages).

supervisors made comments about extending Plaintiff's probation to make him suffer and, in fact, lied to Plaintiff and told him that he had failed probation at the time he passed. (Pl. Opp. 56.1 ¶¶ 16–18.)[4]

Defendant contends that all cleaners hired on or around the same date as Plaintiff were similarly required to serve one-year probationary periods. (Def. 56.1 ¶ 18.) In support of that assertion, Defendant proffered what the Court presumes to be a list of all currently-employed housekeeping staff, their dates of hire (listed as "Sen[i]ority Date"), and their ethnicity, among other things. (Nabors Decl.[5] Ex. E at ECF 2.) Four employees, all of whom are described as African American, are listed as having been hired around the same time as Plaintiff: Robert Glover, Al-Jamel Allah, Elizabeth Dickerson, and Core Harris. (*Id. Cf.* Joseph Dep. at 74:4–17 (describing Glover and Harris as "African-American coworkers" who were "hired the same time as [Plaintiff]" but were "treated better").) For these four individuals, Defendant submitted the following employee history information, reflecting their dates of hire, the dates on which they completed probation, and the dates on which they signed their final probationary report, indicating that they had completed probation:[6]

---

[4] Plaintiff alleges he did not receive the probationary report indicating he passed probation until after his supervisors falsely told him that he had failed probation. (Pl. Opp. 56.1 ¶ 17.) But he does not dispute—or at least, does not cite admissible evidence placing in dispute—the fact that, on September 22, 2011, he signed a fourth and final probationary report "recommend[ing] the probationary period be . . . considered as successfully completed." (Nabors Decl. Ex. D at ECF 5; *see also* Def. 56.1 ¶ 18.)

All citations to "ECF" refer to page numbers generated by the Electronic Court Filing ("ECF") system, and not the document's internal pagination.

[5] All citations to "Nabors Decl." refer to the Declaration of Shawn Nabors in support of Defendant's motion for summary judgment. (Dkt. 100.)

[6] With respect to Allah, Defendant proffers only the third probationary report, signed as of June 22, 2011 and recommending that the probationary period be continued, rather than the final probationary report. (Nabors Decl. Ex. E at ECF 8.)

| Employee | Date Hired | Completion of Probationary Period | Signature on Final Probationary Report |
|---|---|---|---|
| Robert Glover | September 23, 2010 | September 22, 2011 | September 23, 2011 |
| Al-Jamel Allah | October 7, 2010 | October 6, 2011 | N/A |
| Elizabeth Dickerson | November 4, 2010 | November 3, 2011 | October 3, 2011 |
| Core Harris | November 4, 2010 | November 3, 2011 | October 4, 2011 |

(Nabors Decl. Ex. E at ECF 3–10; *see also* Def. 56.1 ¶¶ 19–20 (Harris and Glover required to complete one-year probationary periods).) Plaintiff disputes Defendant's characterization of these records, contending that, in fact, the records serve as "proof that plaintiff's African American counterparts were treated more favorably than plaintiff," since they demonstrate that Harris and Dickerson completed probation in under a year, and that Allah "may have completed probation earlier than plaintiff." (Pl. Opp. 56.1 ¶¶ 18–20.)

C.     Complaints of Discrimination and Workplace Violence

Plaintiff alleges that, throughout his employment at Defendant, he was subjected to a continuing course of discriminatory conduct based on his Haitian national origin and that his supervisors were not only aware of this conduct, but complicit in it. (Pl. Opp. 56.1 ¶¶ 8, 10; *see also* Joseph Dep. at 55:10–56:16 (co-worker named John Gilbert, as well as Nabors, Norman, and Saroop, "routine[ly]" "call[ed] [Plaintiff] names as [he] pass[ed] them by in the hallways or doing [his] chores," names such as "flag boy, boat people, fucking Haitian, . . . [and] [w]annabe black").)[7]

---

[7] The parties dispute virtually every aspect of Plaintiff's employment, including where within Defendant's facility he worked and at what times, such that the parties' papers paint at best a hazy picture of the chronology of Plaintiff's employment. For example, Defendant contends that, from the beginning of his employment, Plaintiff was assigned to the central housekeeping office where part-time cleaners were dispatched to various areas throughout the facility, and that Plaintiff was dispatched from there to work in Buildings #2, #3, and #5 through December 20,

According to Plaintiff, he complained about this conduct, both to his supervisors and to others at BDDSO, but to no avail. (*Id*. ¶ 9.) In support of these claims, Plaintiff submitted affidavits and deposition testimony from two co-workers, Cheryl McClain and Vayolah Larrieux, who worked with Plaintiff during his employment with Defendant. (*See* Larrieux Dep. at 16:15–18, 18:21–19:5, 85:2–12 (Larrieux worked for Defendant in Building #2 from 2003 until approximately the end of 2011, or spring of 2012); *id*. at 28:16–29:5, 31:23–32:13 (Larrieux would see Plaintiff every day at work when he was assigned to Building #2, and saw him a "little less" when he was transferred to Building #5); *see also* McClain Dep. at 7:17–24, 8:23–9:15 (McClain worked with Plaintiff at Defendant for "about two years"; he worked in Building #2, while she worked in Buildings #2, #3, and #5); *id*. at 22:7–23:5 (McClain would see Plaintiff "[p]retty much every day"when she went from Building #5 to Building #2 to smoke cigarettes).)

Both Larrieux and McClain testified to overhearing Plaintiff's supervisors and co-workers call Plaintiff disparaging names based on his Haitian national origin. (*See, e.g.,* Larrieux Dep. at 91:20–93:21 (Larrieux "personally would hear" Nabors, Norman, and Saroop call Plaintiff names, including, *inter alia*, "Flag Boy, Boat People, Voodoo Man, Fucking Haitian, Dirty Haitian, Nasty Haitian, [and] Haitian faggot"); McClain Dep. at 46:4–48:16 (Gilbert made multiple disparaging comments about Plaintiff's national origin to McClain directly, including, *inter alia*, "[i]f [Plaintiff] is walking by, [Gilbert] be like, 'Oh, look at that Haitian nigger. I can't

---

2010, after which he was assigned to Building #2. (Def. 56.1 ¶¶ 12–13.) Plaintiff, on the other hand, claims that he was not assigned to be dispatched to various facilities; rather, he was initially assigned to Building #2, and then was transferred to Building #5 as retaliation for complaining about workplace violence. (Pl. Opp. 56.1 ¶ 12.) Plaintiff also claims that he was required to complete more difficult tasks than other cleaners and never received assistance from other housekeeping staff. (*Id*. ¶ 14.) Defendant, however, asserts that Plaintiff never had to complete more difficult tasks than other cleaners; for example, when Plaintiff's duties included moving furniture, he received assistance from other housekeeping staff. (Def. 56.1. ¶ 14.)

stand that nigger . . . .'"); *id.* at 52:22–53:2 (Nabors would make comments such as, "'That fucking

Haitian. That Haitian. That faggot ass Haitian.'"); *id.* at 56:2–11 (Norman would "reiterate what

was said" by Nabors, *i.e.*, "if [Nabors] said, you know, 'Here comes that fucking Haitian nigger.'

And [Norman] go 'That Haitian nigger . . . .'"); *id.* at 112:20–113:25 (at the end of the day, when

employees were signing out and there was a "crowd," Nabors, with Norman in attendance, would

"run[] his mouth" and begin "antagonizing, [] name calling, talking crap, [making] little

gestures"); *id.* at 114:14–115:7 (Gilbert would "say[] something smart to [Nabors]" when Plaintiff

passed him in the morning). *Cf. id.* at 54:15–20 (Saroop would just listen to Nabors's comments

and laugh).)

Larrieux also testified that she heard Plaintiff complain to his supervisors about this

discriminatory treatment. (*See, e.g.*, Larrieux Dep. at 76:16–77:22 (overheard Plaintiff

complaining to Nabors and Norman that "'I think I'm being treated like that because I'm Haitian.

I'm getting [an] extra heavy [work]load. I'm being denied breaks.'"); *id.* at 109:2–110:3

(overheard Plaintiff complaining to Nabors and Norman that "because he is Haitian, they are

calling him names and they are giving him [an] extra load[,] . . . denying him breaks," and they

would "just laugh or not say nothing and just walk away").)

Defendant, on the other hand, contends that Plaintiff's supervisors—Nabors, Norman, and

Saroop—never made or overheard discriminatory comments regarding Plaintiff's Haitian

descent, and contend further that Plaintiff never complained about such comments. (Def. 56.1 ¶¶

8–10.)

### 1. November 29, 2010 Initial Act of Discrimination

According to Plaintiff, as early as November 29, 2010, when Plaintiff was "talking to [his]

cousin . . . [in their] own language," Gilbert approached him from a group that included Nabors,

Norman, and Saroop and "asked [Plaintiff] exactly where [he] was from," to which Plaintiff replied that he was Haitian. Gilbert responded, "'that is why we hate you on this job, fucking Haitian.'" (Joseph Dep. at 87:24–88:18; *see also id*. at 212:5–17.)[8] Nabors, Norman, and Saroop overheard this comment and laughed. (*Id*. *Cf*. McClain Dep. at 46:4–48:16 (McClain's impression from statements Gilbert made to her was that Gilbert "had a hatred for [Plaintiff]," because "[e]very time he saw [Plaintiff]," *i.e.*, if Plaintiff was "walking by," Gilbert would say "'Oh, look at that Haitian nigger. I can't stand that nigger,'" and always referred to him as "'the Haitian guy'").)

2. April 21, 2011 Incident and Complaint

Several months later, on April 21, 2011, Plaintiff alleges that Gilbert verbally abused him. According to Plaintiff, after a female co-worker walked by and complimented Plaintiff on his work, Gilbert told Plaintiff that "she would never stoop so low to fuck a Haitian guy." (Joseph Dep. at 93:17–94:13.) Later that same day, Gilbert approached Plaintiff again, stating that he did not like Plaintiff and could not "wait to put [Plaintiff's] teeth down [his] throat." (*Id*. at 94:14–19.) Plaintiff complained to Nabors and Norman about this conduct, but neither took any action. (*Id*. at 94:20–95:2 (Nabors asked "what [Plaintiff] want[ed] [him] to do about this," and Norman "told [Plaintiff] if [he] need[ed] to keep [his] job, [to] forget about this [incident]").) Plaintiff

_____

[8] The record is inconsistent regarding whether November 29, 2010 marked the first instance in which Plaintiff's Haitian national origin was raised. (*See, e.g.,* Pl. Opp. 56.1 ¶ 11 ("Norman and Nabors learned [Plaintiff] was Haitian . . . due to an incident on November 29, 2010, when plaintiff was talking Haitian to his cousin.").) For example, in addition to the testimony cited above, Plaintiff testified that "that morning [November 29] wasn't the first time it happened," meaning it was not the first time that Gilbert had made "a comment like that." (*Id*. at 87:3–23.) Plaintiff further testified that, on November 29th, he approached Norman and Nabors and told them that "this wasn't the first time [Gilbert] made the comment," (*id*. at 88:21–89:7), and also that the November 29th complaint to Norman and Nabors "wasn't the first time [Plaintiff] . . . went to them and complained" (*id*. at 89:8–14).

then complained about this abuse to Defendant's Deputy Director, Jane Williamson, and requested "the right to go for workplace violence," presumably referring to the Workplace Violence Incident Reporting Form, discussed *infra*. (*Id*. at 56:17–57:5; *see also id*. at 95:3–11 (Williamson "was the one that told [Plaintiff] [to] go ahead, file a worker's violence [report], which [Nabors] had to go ahead and investigate").) Plaintiff testified that he told Williamson he had been verbally abused by Gilbert on that day, but also told her "it was routine," that Gilbert would call Plaintiff names as he passed him in the hallways, and that none of his supervisors would "come to [Plaintiff's] rescue or try to help [him] out to fix the situation." (*Id*. at 57:9–19.) It is undisputed that Plaintiff did not tell Williamson at this time that his supervisors made comments similar to Gilbert's. (*Id*. at 57:20–25.)

Plaintiff filed a Workplace Violence Incident Reporting Form, complaining of Gilbert's conduct that day. (Def. 56.1 ¶ 22; *see also* Nabors Decl. Ex. A.) In it, Plaintiff complained that Gilbert had walked passed Plaintiff and stated that he "wanted to . . . smack the shit out of [Plaintiff]," though the complaint did not mention or allude to any discriminatory remarks by Gilbert or any discriminatory motivation for Gilbert's conduct. (Nabors Decl. Ex. A; *see also* Def. 56.1 ¶ 23.)[9] Rather, it noted only that Plaintiff "told [his] supervisor" what had occurred and "was told not to mingle with [Gilbert]," but that he still felt threatened. (*See* Nabors Decl. Ex. A; *see also* Def. 56.1 ¶ 25 (after the incident, Plaintiff told Nabors he had been threatened).)[10]

---

[9] Plaintiff testified that he "couldn't mention" Gilbert's discriminatory comments, because he was "still on probation" and "nobody wanted to come to [his] rescue, and [he] felt [his] job was on the line." (Joseph Dep. at 97:13–98:4.)

[10] Plaintiff's written complaint itself notes that Plaintiff "was told not to mingle with [Gilbert]." (Nabors Decl. Ex. A.) Nevertheless, Plaintiff now disputes that Nabors told him to avoid Gilbert until he could be reassigned to another location, and claims instead that Nabors responded by "stating there was nothing he would do about it." (*Compare* Def. 56.1 ¶ 26, *with* Pl. Opp. 56.1 ¶ 26.)

Nabors submitted his own Workplace Violence Incident Reporting Form on April 21, 2011, describing Plaintiff's complaint as alleging that Gilbert "threatened to slap the shit out of him" and describing Nabors' own response as telling Plaintiff "to avoid Mr. Gilbert until [Nabors] can reassign [Plaintiff] to another location so no further confrontation will ensue." (Nabors Decl. Ex. B; *see also* Def. 56.1 ¶¶ 26–27.)[11] Upon receiving both Plaintiff's complaint and Nabors's report, Defendant's former Director Donna Limiti completed an Incident Review Form dated April 26, 2011, which was then forwarded to Defendant's Workplace Violence Committee ("the Committee").[12] (Morse Decl.[13] ¶ 7; *see also* Def. 56.1 ¶ 28.) The Incident Review Form described Plaintiff's complaint as alleging that "JG [John Gilbert] threatened him" and noted that Plaintiff's "supervisor separated both staff." (Morse Decl. Ex. A.) Limiti noted that "JG [Gilbert] has been the target of several WPV [workplace violence] incidents[,][14] however it is generally one person's word against another." (*Id*.) Limiti's report contained no written recommendation

---

[11] Despite the fact that Plaintiff's own written complaint contained no allegations of discriminatory comments made by Gilbert or discriminatory motives for Gilbert's conduct (Nabors Decl. Ex. A; Def. 56.1 ¶ 23), Plaintiff contends that Nabors failed to report Plaintiff's complaints about disparaging comments in Nabor's Workplace Violence Incident Reporting Form regarding the April 21, 2011 incident (Pl. Opp. 56.1 ¶ 27).

[12] The Committee reviews employee complaints about threatening or dangerous behavior that occurs between employees, and also reviews the recommendation of Defendant's Director to determine whether the recommended action is appropriate. (Def. 56.1 ¶ 29.)

[13] All citations to "Morse Decl." refer to the Declaration of Sheryl Morse in support of Defendant's motion for summary judgment. (Dkt. 103.)

[14] While Plaintiff's complaint indicated that *he* was the target of a workplace violence incident initiated by Gilbert, Limiti's Incident Review Form stated that Gilbert himself "has been the target of several WPV incidents." (Morse Decl. Ex. A.) It is unclear whether this was a typographical error by Limiti, whether Limiti was referring to multiple workplace violence complaints having been filed *against* Gilbert, or whether, in fact, Gilbert himself had suffered workplace violence incidents, but in any event, the resolution of this ambiguity is not relevant to the Court's determination here.

(*id*.), but it is undisputed that Plaintiff was subsequently transferred to Building #5 (Def. 56.1 ¶ 31). That Limiti recommended the transfer is seemingly corroborated by a portion of her Incident Review Form[15] that purports to detail the "disposition (WPV Coordinator Follow-up)" of the incident, and describes a meeting with Plaintiff on June 8, 2011 in which Plaintiff reported "not feel[ing] threatened at th[at] time," but "concerned on why [he] had to be moved and not the aggressor." (Morse Decl. Ex. A.) At this meeting, Plaintiff was allegedly "advised to report any threats immediately if JG approache[d] him." (*Id*.)

Defendant contends that the April 21, 2011 incident was handled according to its internal policies. (Def. 56.1 ¶ 32.) Plaintiff contests this, arguing that no one from the Committee ever contacted Plaintiff or investigated the incident, that the Committee is a "sham," and that Defendant "sweeps these allegations under the rug and conceals evidence of misconduct." (*Compare* Morse Decl. ¶¶ 3–4 (after an employee files a complaint and brings it to the attention of his/her immediate supervisor, and the supervisor provides a written report and recommendation, the Committee reviews both the employee complaint and the supervisor report and recommendation, and either agrees or disagrees with the recommended action); *id*. ¶ 5 (members of the Committee "act as liaisons to BDDSO employees who file complaints, . . . speak[ing] to employees who have submitted a workplace violence complaint to keep them informed as to the status of the investigation," and Arlene Dexter was Plaintiff's liaison), *with* Pl. Opp. 56.1 ¶ 32 ("no one from any purported work place violence committee ever contacted plaintiff o[r] investigated this [April 21] matter).)

According to Plaintiff, after the April 21, 2011 incident and his complaint, Nabors told Plaintiff that he "was the aggressor, and had to leave building two, and . . . go back to building

---

[15] The copy of the Incident Review Form that is in the record is partially cut off.

five." (Joseph Dep. at 99:6–23; *see also id.* at 99:24–100:8 (Plaintiff "didn't get no formal report [sic]," but was "told orally to get out of building two and come to building five, because [he] was the aggressor [and] couldn't be on the [same] premises as Gilbert").)  Defendant claims that Plaintiff's transfer to Building #5 did not change his title, hours, duties, or any other benefits of his employment.  (Def. 56.1 ¶ 33.)  Plaintiff disputes this, asserting that his supervisors condoned and were participants in "the abuse" he suffered and that Nabors, the supervisor who recommended the transfer, "notified plaintiff he was being treated as the initial aggressor and transferred to building 5 as punishment."  (Pl. Opp. 56.1 ¶ 33.)  Plaintiff contends that the transfer "also facilitated John Gilbert's ability to physically assault [him] with a commercial dryer on 12/22/14."[16]  (*Id.*)

### 3.  May 18, 2011 Flag Day Incident

On May 18, 2011, which Plaintiff testified was "Haitian flag day," Plaintiff came into work wearing a t-shirt with a Haitian flag on it.  Plaintiff testified that Saroop approached him, asked why he was wearing that shirt and "[did] [Plaintiff] think [he was] back home," and then went to get Nabors, who "smile[d] and laughed at [Plaintiff]."  (Joseph Dep. at 64:20–65:24; *see also id.* at 216:7–12 (Saroop "started calling [Plaintiff] flag boy at the May 18th [2011] incident.").)[17] According to Plaintiff, "[f]rom that day on, [his] name on the job . . . [b]esides boat people, . . . was also . . . flag boy."  (*Id.* at 65:25 –66:6; *see also* Larrieux Dep. at 49:2–8 (Larrieux

---

[16] The Court presumes the reference to "12/22/14" is a typographical error, as it is undisputed that Plaintiff filed a workplace violence complaint on December 22, *2011* regarding the incident involving Gilbert hitting him with the door of a commercial dryer.  (*See* Def. 56.1 ¶ 34.)

[17] Plaintiff testified that, prior to this incident, he had a "regular working relationship" with Saroop, as well as with Nabors and Norman, meaning that they would give him "details in the morning," presumably regarding his assignment(s) for the day, "and that would be it."  (Joseph Dep. at 72:8–22.)

heard Saroop calling Plaintiff "Flag Boy," "Nasty Haitian," and "Dirty Haitian"). *Cf.* McClain Dep. at 70:18–71:9 (Plaintiff wore a white shirt with the Haitian flag on it and McClain heard Nabors refer to Plaintiff as flag boy, and "[a]fter that, [Plaintiff] was labeled with that name 'Flag Boy.'").)

Plaintiff testified that after this May 18, 2011 incident, his "existing workload was doubled," in that he was asked to stay for extra time, even if he did not want to. He was assigned the work of between two to four people, sometimes even up to eight people, and was denied breaks, while his African-American co-workers—specifically Glover and Harris, who were part-time "non-Haitian, African-America[n] coworkers, hired the same time as [Plaintiff]"—received breaks and were not assigned extra time. (Joseph Dep. at 73:2–74:23).)

4.    September 2011 Incident

In September 2011, Plaintiff cleaned an area in the maintenance department for two hours, and when he was done, Nabors approached him and told him to do it again. When Plaintiff asked why, Nabors replied, "'I don't like you people . . . I don't like freaking Haitians,'" which he reiterated when Plaintiff asked him why he was targeting Plaintiff. (Joseph Dep. at 77:18–78:15.) Plaintiff testified that there was no one present for this incident. (*Id.* at 78:16–23.)[18]

While Plaintiff did not file a complaint against Nabors, he complained to Williamson that same afternoon. (*Id.* at 78:24–79:4.) According to Plaintiff, he complained about the entire

---

[18] Larrieux testified—presumably as to an incident prior to the September 2011 one described by Plaintiff, since Plaintiff had been transferred from Building #2 to Building #5 after the April 2011 incident—that she was in Building #2 when she saw Nabors approach Plaintiff after he finished a job and order him to do the entire job again. (Larrieux Dep. at 98:22–99:6.) Larrieux also testified that she saw Nabors approach Plaintiff after he had finished cleaning an area and told him to "reclean the same area over again," but she did not testify as to the date of this incident. (*Id.* at 71:15–24.) Similarly, McClain testified that during Plaintiff's probation period—within the first year of his employment—Nabors repeatedly made Plaintiff do work over again, *i.e.*, "clean the bathrooms [and] do the floor." (*See* McClain Dep. at 72:16–73:14.)

history of discriminatory conduct, beginning with the November 2010 incident in which Gilbert approached Plaintiff and asked about his ethnicity and the April 2011 incident of Gilbert verbally abusing him. (*Id*. at 225:22–226:19.) Though Williamson told Plaintiff that she would talk to his supervisors to see what she could do, she also called him "an angry guy . . . [f]or complaining too much" (*id*. at 79:10–23), and ultimately "never did anything on [Plaintiff's] behalf" (*id*. at 226:25–227:5). (*See also id*. at 227:6–228:11 (despite Plaintiff telling Williamson "everything," including the fact that his supervisors were calling him names such as "fresh Haitian," "boat people," "flag boy," and "wannabe black," Williamson "never did anything . . . to help [Plaintiff] out").)

In October 2011, Plaintiff was ordered to clean the floors of nine rooms, which he "felt like four men should have been doing," given the workload. (*Id*. at 85:10–87:2; *see also* McClain Dep. at 147:12–148:3 ("One person can't scrub a floor by themselves"; typically "[f]or a wing, you need at least three people," but Plaintiff's supervisors would "sometimes give [Plaintiff] a wing by himself").) Nabors continued to allow Plaintiff's African-American co-workers to go on protracted breaks but denied Plaintiff all breaks. (*See, e.g.*, Joseph Dep. at 73:2–13 (after May 18, 2011, Plaintiff "was denied breaks in the morning"); *id*. at 74:24–75:6 (Plaintiff "wouldn't know" how many breaks he was entitled to as a part-time housekeeper "because [he] was denied breaks all the time" and was never given a lunch break); *see also* McClain Dep. at 109:10–110:19 (because Plaintiff was assigned to clean the floors, "it would run into lunchtime [and] [h]e couldn't have lunch," since "[w]hen you do the floors, you need . . . at least three people," and "[i]f one person does it, it's going to take longer," which is "why a lot of times . . . [his supervisors] would give [an assignment] to him too late in the day where it would run into his lunch hour"); *id*. at 158:5–160:4 (same).)

5. December 22, 2011 Complaint

On December 22, 2011, Plaintiff had another altercation with Gilbert, this time physical. (*See* Joseph Dep. at 101:21–102:2.) In the morning, shortly after Plaintiff signed into work, Gilbert approached him from the back, picked up a commercial dryer door, and hit Plaintiff with it several times, stating, "'I don't like you freaking Haitian. You better come out in the yard and fight.'" (*Id*. at 102:10–23; *see also id.* at 105:4–16 (he was standing when Gilbert hit him, Gilbert hit him twice, and no one was in the room when it happened, but Nabors was "[a]round the corner, about 25 feet [away]").)[19] Gilbert then proceeded to walk away, towards Nabors, and said loudly, "'come to the yard, I want to mess you up, you fucking Haitian,'" which Nabors could hear. (*Id*. at 105:19–106:12.)

The day before this incident, on December 21, 2011, Larrieux testified that she overheard a conversation between Gilbert and Nabors take place behind Building #2, outside of a back entrance where smokers would take their breaks. (Larrieux Dep. at 59:10–22.) According to Larrieux, Gilbert said to Nabors that he was "'going to fuck that fucking Haitian Jimmy Joseph up,'" and Nabors replied, "'Fuck that Haitian boy. Flag Boy deserves it.'" (*Id*. at 58:8–22; *see also id*. at 102:3–103:24.)[20]

_____

[19] It appears that this incident took place in Building 5, to which Plaintiff was assigned to work but Gilbert was not. (Joseph Dep. at 103:25–104:20 (Plaintiff "was assigned to that area in building five" after being "transferred from the first workplace violence [complaint] [o]n April 21st[, 2011]" and he and Gilbert were "told to stay away from each other").)

[20] Time records submitted by Defendant indicate that Larrieux did not work on December 21 or 22, 2011. (*See* Martinez Decl. Ex. A.) All citations to "Martinez Decl." refer to the Declaration of Rosemary Martinez in support of Defendant's motion for summary judgment. (Dkt. 107.)

These records are dated "03-03-2015" with a time stamp of 10:50:49 AM, and while they bear the typed signature of a supervisor, they do not bear Larrieux's signature. (Martinez Decl. Ex. A.) Having been shown these time records at her deposition, Larrieux testified that she believes they may have been forged. (*See* Larrieux Dep. at 125:23–126:12 (Defendant "will forge

The morning of December 22, Larrieux testified, as she was signing in to work, she overheard Gilbert and Nabors speaking again, this time in the hallway of Building #2 near the entrance "as you walk in . . . by the wing" near where Larrieux worked. (*Id*. at 61:22–62:25.) She heard Gilbert say that "he was going to beat up [the] fucking Haitian," and Nabors reply, "'Do what you have to do. Flag Boy deserves a beating anyway. Maybe whoop his ass, he will finally quit,'" after which she observed Gilbert and Nabors both walking from Building #2 to Building #5. (*Id*. at 60:15–61:13.)

After Gilbert's assault on December 22, Plaintiff went to see Chief of Safety Denacola[21] to report the assault. Plaintiff found Denacola "standing around, talking to [] Nabors, . . . and they were laughing at [Plaintiff] calling [him] names." Plaintiff requested that Denacola call 911, but Denacola refused, saying that Plaintiff would lose his job if Denacola called 911, but that he would instead handle the situation internally, by speaking to Plaintiff's supervisor. (Joseph Dep. at 58:19–59:6, 59:23–60:9*; see also id*. at 103:10–18 (same); *id*. at 119:17–24 (same).)

On his way to see Denacola, Plaintiff testified that he overheard Gilbert telling Nabors that "he just took care of the flag boy," to which Nabors responded, "'what happened to him? He fell off the boat.'" (*Id*. at 90:11–25*; see also id*. at 102:24–103:9 (same).) Similarly, McClain

---

anything"); *id*. at 131:15–132:4 (believes that the time sheet shown to her at her deposition "was forged," in part because "[u]sually the supervisor has to hand sign the . . . paper that [the employee] get[s]" whereas the time sheet was typed, and she "[did]n't remember the paper looking like this").) Larrieux testified unequivocally that she was at work on December 21 and 22, 2011. (*See id*. at 121:7–14 (despite being shown time records that allegedly indicate on December 21, 2011, she was not at work, Larrieux testified that she "know[s] [she] was at work that morning"); *id*. at 129:4–9 (Larrieux testified that she was at work on December 21 and 22, 2011).)

[21] Plaintiff's testimony did not include Chief Denacola's first name, but he is described as Defendant's "chief of safety." (Joseph Dep. at 59:19–22 ("Q. You said the chief of safety? A. Right. Q. Is that Chief Denacola? A. Yes.").)

testified that while in the women's locker room, she overheard a conversation between Gilbert and Nabors on December 22, 2011, in which Gilbert told Nabors that he "'fucked [Plaintiff] up.'" (McClain Dep. at 125:20–126:14, 169:24–170:9.)

After speaking with Denacola, Plaintiff went to Williamson to complain about Gilbert's attack, but she told him to keep quiet if he wanted to keep his job. (Joseph Dep. at 107:18–108:8; *see also id*. at 108:12–22 (after Plaintiff was hit, he first went to safety, then to Williamson, then filed a report, and then left work and went home).) Plaintiff then spoke to Donna Leon[22] in the personnel office, who gave him the paperwork to file another Workplace Violence Incident Reporting Form (*id*. at 118:7–15), which Plaintiff completed, alleging that Gilbert struck him in the back with a dryer door[23] (Def. 56.1 ¶ 34).[24] It is undisputed that Plaintiff's written complaint did not allege that Gilbert made any discriminatory remarks about Plaintiff being Haitian or otherwise. (*Id*. ¶ 35.) According to Plaintiff, he "didn't really have to emphasize . . . [the

---

[22] Leon's name is mis-transcribed as "Leone" in Plaintiff's deposition. (*See* Declaration of Donna Leon (Dkt. 96, "Leon Decl."), submitted in support of Defendant's motion for summary judgment.)

[23] As best as the Court can discern, Plaintiff's largely illegible written complaint states: "While trying to organize my cart for work, I was [] by John Gilbert who hit me with the door of the dryer. He stated 'I know you're playing games,' and hit me in the back with the door of the dryer one more time. [] to close the door []. By telling, 'you know what time everybody get off, you want to play games.' I am not here to be coerced or intimidated by anyone." (Morse Decl. Ex. B (indecipherable text denoted in brackets).

[24] A handwritten statement dated January 3, 2012 and signed by John Gilbert that same day describes the December 22, 2011 incident quite differently, asserting that Gilbert was trying to get a mop out of the dryer, that Plaintiff "came up behind [Gilbert] with his cleaning cart" and that the two "did not speak to each other," but that when Gilbert attempted to open the dryer door to retrieve the mop, Plaintiff "stepped in front [of Gilbert's] path preventing the door from opening all the way." (Norman Decl. Ex. C.) Gilbert claims he then said to Plaintiff, "'Why you playing games?'" and "'I get off at 3:30,'" at which point Plaintiff "giggled and walked away." (*Id*.)

All citations to "Norman Decl." refer to the Declaration of James Norman in support of Defendant's motion for summary judgment. (Dkt. 101.)

discriminatory statements] in the report, because [Plaintiff] had already made it known to everybody . . . orally [that] [Gilbert] was calling [Plaintiff] names, from day one," and "nobody ever did anything on [Plaintiff's] behalf," so Plaintiff thought it was a "waste [of] time . . . [to] put it on paper[] where it wasn't going to mean anything." (Joseph Dep. at 106:18–107:9.)

Plaintiff's immediate supervisor, Norman, completed a supervisor's Workplace Violence Incident Reporting Form with respect to the December 22, 2011 incident, which both he and Nabors signed that day. (Def. 56.1 ¶ 37; *see also* Norman Decl. Ex. B.) In the portion of the form signed as "completed by" Norman, a handwritten comment reads only that "[he] will see Mr. John Gilbert so [he] can report the need actions [sic] to be taken." (Norman Decl. Ex. B at ECF 2.) A handwritten comment underneath Nabors's signature describes Plaintiff telling the writer—which the Court presumes to be Nabors—that "while [Plaintiff] was preparing for work, Mr. John Gilbert pushed the dryer door located in the housekeeping office and the door hit [Plaintiff] in the back. [Nabors] told both employees to stay away from each other until a resolution to the problem is made." (*Id.*) Attached to Norman's Workplace Violence Incident Reporting Form is a separate handwritten statement, dated December 22, 2011 at 4:27 pm and signed by Norman on that day, which describes Norman's interaction with Plaintiff about the December 22 incident as follows:

> At approximately 8:15am, [Plaintiff] came to [Norman] and said he needed to complete workplace violence report papers . . . [because] he was in the Housekeeping area where the dryer is located . . . [and] while he was there, Mr. John Gilbert, cleaner[,] was there and proceeded to hit him once in the back with the dryer door . . . [and] hit him again. Apparently Mr. Gilbert was taking mops out of the dryer when he hit [Plaintiff] with the door. [Plaintiff] then stated [to Norman] [that] he's tired of this and people messing with him. [Norman] then proceeded to calm [Plaintiff] down, told him to sit down . . . gave him room on [Norman's] desk to complete the papers. [Norman] completed the supervisor section and then [Plaintiff] left and turned the papers in to the Safety Department.

(*Id.* at ECF 3.) It is undisputed that no disciplinary actions were taken against Gilbert as a result of the December 22, 2011 incident. (Def. 56.1 ¶ 38.) Defendant contends that the incident was

handled according to Defendant's internal policies (*id.* ¶ 43), but Plaintiff disputes this (Pl. Opp. 56.1 ¶ 43). Plaintiff contends that, because he complained about the incident, he was penalized by being transferred to Shirtz 2[25] and Nabors told him that this transfer was permanent because Plaintiff was alleged to have been the aggressor. (*See id.* ¶¶ 38–42.)

After the December 22, 2011 physical altercation, Larrieux heard Gilbert and Nabors talking and laughing about it behind Building #2, with Nabors saying "Flag Boy fell off the boat or Flag Boy took a beating." (Larrieux Dep. at 65:21–66:13.) Through a vent in the women's bathroom, McClain overheard a conversation between Nabors and Norman, in which Nabors informed Norman that he had fixed the dryer so "'[n]obody is going to believe Jimmy, because we fixed it,'" and when Norman asked what they were going to do with Plaintiff, Nabors allegedly responded, "'we can send him to Shirtz . . . Either he won't be able to do the work and he will quit or we have to fire him because he is not doing the work properly.'" (McClain Dep. at 56:18–57:24; *see also id.* at 127:25–128:12 (overheard conversation from the women's bathroom, in which Norman asked what they were going to do with Plaintiff and Nabors replied that they could "'send him over to Shirtz [a]nd he either [is] going to be able to do the job or he is going to quit'").) McClain testified that she overheard multiple similar comments in the aftermath of Plaintiff's transfer to Shirtz 2, *i.e.*, "[s]omebody would mention [Plaintiff]" and Norman would say "'Let's see,'" while Nabors said, "'He ain't going to last. Let's see what happens.'" (*Id.* at 130:17–131:9.)

---

[25] It appears from the record that Defendant had various facilities, referred to by building number. The exception appears to be a facility referred to as "Shirtz 2," described by Plaintiff as a "house that the [Defendant] owned" (Joseph Dep. at 37:8–15 (transcribed as "shirt two")), and by Defendant as "another residential facility" of Defendant's, seemingly distinct from that referred to by the parties as "Building #2" (*compare* Nabors Decl. ¶ 12 (describing Plaintiff's work in "Building #2," *with id.* ¶ 20 (describing Plaintiff's transfer to "the Shirtz facility"))).

6.    January 2, 2012 Transfer and Subsequent Medical Leave

After the December 22, 2011 incident, once he had complained to Denacola and Williamson, and had filed the Workplace Violence Incident Reporting Form, Plaintiff left work and went home. (Joseph Dep. at 108:12–22.) He did not return until January 2, 2012, when he was summoned to a meeting with Nabors, Norman, and a woman named Althea Foster,[26] in which Plaintiff alleges Nabors told him he was once again being labeled the aggressor and was being transferred from Building #5 to Shirtz 2. (*Id.* at 109:2–110:3, 122:5–20; *see also id.* at 116:23–117:7, 123:6–12.) Limiti, in a Workplace Violence Incident Review Form Addendum signed on January 2, 2012—the day of Plaintiff's meeting with Nabors, Norman, and Foster and one day before Gilbert's written statement regarding the December 22, 2011 incident—wrote that Human Resources was "investigating" the December 22, 2011 incident, "as one participant (the alleged aggressor) has frequently been targeted," while "JJ [Plaintiff], the victim, has been re-assigned temporarily . . . until the investigation is concluded." (Morse Decl. Ex. C; *see also* Def. 56.1 ¶ 39.) Plaintiff was transferred to "the Shirtz facility" on January 4, 2012 (Def. 56.1 ¶ 40), and the Committee agreed with Limiti's recommendation regarding the transfer on January 11, 2012 (Morse Decl. Ex. C; *see also* Def. 56.1 ¶ 42).

Defendant contends that the transfer to the Shirtz facility did not change Plaintiff's title, hours, duties, or any other benefits of his employment. (Def. 56.1 ¶ 41.) According to Plaintiff, however, the transfer constituted a "transformation in his duties and . . . an adverse employment action," because "the workload was tripled and there was no one to assist him," such that the transfer "willfully exacerbate[d] [Plaintiff's] back injury" resulting from the December 22

---

[26] Plaintiff was "not sure who [Foster] is exactly," but testified that he thought she may be a "human resources rep." (Joseph Dep. at 122:5–13.)

incident, for which he provided medical proof to Defendant on January 2, 2012.[27] (Pl. Opp. 56.1 ¶ 41.) (*See also* Joseph Dep. at 110:4–13 (after the transfer to Shirtz 2, Plaintiff's work "not only got doubled, it got tripled," and there was "no staff there to help [Plaintiff] out[,] [he] was pretty much doing everything on [his] own, even though [his supervisors] knew [he] had . . . [a] herniated disk with [a] pinched nerve."); *id*. at 117:14–24 (his supervisors remained the same in Shirtz 2; "nothing else changed but [his] location" and his "workload got tripled"); *id*. at 128:7–17 (same).)[28]

Plaintiff worked at Shirtz 2 for "a few weeks or so" after the January 2, 2012 meeting. (*Id*. at 126:25–127:7, 131:2–5.) Ultimately Plaintiff took medical leave due to pain in his back, for which he ultimately required surgery, scheduled for May 2014. (*Id*. at 40:3–12, 43:6–19.)[29] In a letter dated February 10, 2014, the New York State Office for People with Developmental Disabilities ("OPWDD") informed Plaintiff that he would be terminated from BDDSO on March

---

[27] The Court is unable to find any evidence of this medical proof in the record. Nevertheless, it is undisputed that Plaintiff went out on worker's compensation leave after working at Shirtz 2 for several weeks, as discussed, *infra*.

[28] Plaintiff also alleged that when he got to Shirtz 2, his "pay got played with," meaning he "lost a lot of paychecks" and "[t]here was a lot of time that wasn't given to [him]." (Joseph Dep. at 129:25–130:17 (complained to Norman that he "didn't get [his] paycheck" and Norman told Plaintiff he would look into it, but "that was the last time [Plaintiff] seen [sic] the man").)

[29] Plaintiff alleges he was initially denied worker's compensation pay, but there is some inconsistency in Plaintiff's deposition on this point, as Plaintiff testified that when he "went to the doctor following the incident on December 22nd [of 2011]," "[t]hat was handled through workers' compensation . . . ." (*Compare* Joseph Dep. at 43:20–25, *with id*. at 145:20–25.) Moreover, Plaintiff admits that he received a letter from Defendant informing him that he "never provided them [his] monthly medical report" and that he eventually started receiving worker's compensation. (*Id*. at 43:20–25, 44:2–16.) Record evidence indicates that Plaintiff went out on worker's compensation leave on January 29, 2012. (Sansolo Decl. Ex. F.) Indeed, Plaintiff attached to his original complaint a letter from Defendant dated March 30, 2012, indicating that Plaintiff had been on worker's compensation leave since January 29, 2012, but that he had not yet provided medical substantiation therefor (*see* Dkt. 1 at ECF 15). (*Cf. supra* n.27.)

11, 2014, "due to completion of two cumulative year(s) of absence." (Sansolo Decl. Ex. F;[30] *see also* Def. 56.1 ¶ 21 (Plaintiff terminated on March 11, 2014).)

       7.    <u>February 2, 2012 New York Inspector General Complaint & June 25, 2012 Equal Employment Opportunity Commission ("EEOC") Charge</u>

In addition to his April 21 and December 22, 2011 workplace violence complaints, Plaintiff also filed a hotline complaint with the New York State Inspector General's office ("the IG's Office") on February 2, 2012, expressing dissatisfaction with Defendant's handling of his workplace violence complaints, delays in receiving health benefits, overtime pay, and hazard duty pay, and Defendant's processing of his direct deposit application. (Def. 56.1 ¶ 44; *see also* Sansolo Decl. Ex. B; Odom Decl.[31] Ex. A.[32]) The IG's Office forwarded Plaintiff's complaint to Defendant's internal investigation office and to the Central Office of the OPWDD, after which Morse, Defendant's Affirmative Action Administrator, attempted to contact Plaintiff by mail. (Def. 56.1 ¶ 45.) Plaintiff, however, refused to have Morse conduct the internal investigation, and it was forwarded for Donald Odom, the former Affirmative Action Administrator of the Metro NY Developmental Disabilities Services Office ("MDDSO"),[33] to handle. (*Id.* ¶ 46; *see also* Odom Decl. ¶¶ 2, 4.) Odom met with Plaintiff on July 3, 2012 to review Plaintiff's complaint, as well as Plaintiff's email requesting that an entity outside of Defendant investigate

---

[30] Two dates appear on this letter—February 10, 2013 on the first page and February 10, 2014 on the second page. In light of the information contained in the letter, as well as the other dates therein, the Court presumes the 2013 date to be a typographical error.

[31] All citations to "Odom Decl." refer to the Declaration of Donald Odom in support of Defendant's motion for summary judgment. (Dkt. 99.)

[32] Exhibit B to the Sansolo declaration and Exhibit A to the Odom declaration appear to be identical copies of the complaint that Plaintiff filed with the IG's Office, which in turn, was the same complaint Plaintiff filed as his charge with the EEOC, discussed *infra*. (Def. 56.1 ¶ 54.)

[33] The record does not reflect the nature of the relationship between Defendant and MDDSO, or between the IG's Office and MDDSO.

his complaint.  (Def. 56.1 ¶ 47.)

Plaintiff's written complaint to the IG's Office alleges that he is from Haiti and that after being hired as a housekeeping employee at Defendant, he "became subjected to a lot of discrimination from the supervisors and other state employees at the facility."  (Sansolo Decl. Ex. B at ECF 2.)  The charge claims that, while Plaintiff was assigned to "building 2," he "felt that [his] safety was at risk due to the fact that [he] was verbally threatened by another housekeeping employee . . . that told [Plaintiff] that he was going to slap the hell out of [him]."  The charge claims that when Plaintiff "file[d] a work place violence [complaint]," his supervisors "handled the situation as if [Plaintiff] wasn't a victim," telling Plaintiff that he "probably was the one that said something" to the allegedly threatening employee and then "remov[ing] [Plaintiff] from the building and [taking] the other employee's side because [Plaintiff] was not part of their click [sic]."  (*Id*.)  Plaintiff was then transferred to a different building where he was "subjected to more discrimination," of which "the supervisors were [] aware," culminating with Plaintiff being "attacked . . . by the same individual."  (*Id*. at ECF 2–3.)  Plaintiff concluded by stating that the charge was meant "to let people know the discrimination that foreigners go through," and that it is not "fair" and "not right" for "anyone to be treated this way regardless of [their] place of origin, race, skin color nor [sic] gender."  (*Id*. at ECF 3.)

While it is undisputed that Plaintiff's written complaint does not explicitly allege or reference discriminatory or derogatory comments about Plaintiff's Haitian national origin (Sansolo Decl. Ex. B; Odom Decl. Ex. A; *see also* Def. 56.1 ¶ 49), the parties dispute whether Odom was told about these comments by Plaintiff and Larrieux. On the one hand, Defendant contends that Odom met with Plaintiff on three occasions during the course of his investigation, each time specifically asking Plaintiff if anyone had said anything to him regarding his Haitian

ethnicity, but that Plaintiff "specifically denied that anyone had said anything to him regarding his Haitian ethnicity." (Def. 56.1 ¶¶ 50-51. *But see* Odom Decl. Ex. B (Odom's July 12, 2012 final report of his investigation of Plaintiff's claims documents only one meeting with Plaintiff, on July 3, 2012).) Meanwhile, Plaintiff contends that he *did* complain about these discriminatory/disparaging comments and about retaliation for complaining about the discrimination, and that Larrieux, whom Odom interviewed, also told Odom about ethnically derogatory comments made to and abuse inflicted upon Plaintiff. (Pl. Opp. 56.1 ¶¶ 48–51.) Larrieux testified that she accompanied Plaintiff to his meeting with Odom, and that she told Odom that "from the time [Plaintiff] started working, they was calling him names: Voodoo; Haitian; Flag Boy; nasty, dirty Haitian; Voodoo Man," and giving him "workloads that four men are supposed to do." (Larrieux Dep. at 70:11–71:19.) According to Larrieux, she also told Odom about the conversation between Gilbert and Nabors in advance of Gilbert's December 22, 2011 attack. (*Id.* at 71:24–72:19.)

Odom completed his investigation on July 12, 2012, submitting a written report that concluded there was no evidence to support Plaintiff's complaints that Defendant had discriminated against him. Odom informed Plaintiff of these results in a written letter. (Def. 56.1 ¶¶ 52–53; *see also* Odom Decl. Exs. B–C.) Prior to receiving Odom's report, however, on June 25, 2012, Plaintiff filed a complaint with the EEOC, the substance of which was essentially the same as his complaint to the IG's Office. (Def. 56.1 ¶ 54.) Again, the EEOC charge did not include any allegation of discriminatory or derogatory comments regarding Plaintiff's Haitian national origin, nor did it include allegations about the complicity or participation of Plaintiff's supervisors in this conduct. (*Id.* ¶ 55.) On July 12, 2012, Plaintiff received a letter from the EEOC, informing him that, based on the information included in his charge and the evidence he

submitted, the EEOC had determined there was "not enough information to conclude that further investigation would likely result in a violation of federal law."  (Sansolo Decl. Ex. C; *see also* Def. 56.1 ¶ 56.)

### 8. Other Discriminatory Conduct

Plaintiff contends that, throughout his employment, he was also subjected to a myriad of other forms of discriminatory conduct, including, *inter alia*, that he was denied insurance benefits that his non-Haitian, African-American co-workers received (*compare* Def. 56.1 ¶¶ 68–75, *with* Pl. Opp. 56.1 ¶¶ 68–75 *and* Joseph Dep. at 140:6–146:9), that he was denied breaks during the workday (Joseph Dep. at 73:2–13, 74:24–75:6), and that he was denied a promotion to a position that would have improved his pay (*see id.* at 134:4–138:24).

## II. Procedural History

Plaintiff, acting *pro se*, filed his original Complaint in this action on August 29, 2012. (Dkt. 1; Def. 56.1 ¶ 57.)  The Complaint contained no allegations of any discriminatory or derogatory comments being made about Plaintiff's Haitian national origin.  (Def. 56.1 ¶ 58.) Defendant moved to dismiss the Complaint on November 29, 2012 (Dkt. 11; Def. 56.1 ¶ 59), and the Honorable John Gleeson held oral argument on the motion on January 4, 2013 (Dkt. 18; Def 56.1 ¶ 60; *see also* Sansolo Decl. Ex. E (oral argument transcript excerpts)).  During oral argument, Judge Gleeson asked Plaintiff about the basis for his allegation that he was treated poorly because of a protected status, and Plaintiff did not mention any of the derogatory names he now alleges he was called, nor did he tell Judge Gleeson about the May 18, 2011 incident regarding Plaintiff's Haitian t-shirt.  (Def. 56.1 ¶¶ 61–62.)  On January 15, 2013, Judge Gleeson granted Defendant's motion to dismiss, concluding that Plaintiff had failed to state a claim under Title VII, but permitting Plaintiff the opportunity to file an amended complaint on the basis of his national origin.  (Dkt. 20; Def. 56.1 ¶ 63.)  After obtaining counsel, Plaintiff filed an amended

complaint on April 5, 2013 (Dkt. 23; Def. 56.1 ¶ 64), and the SAC—the operative complaint in this action—on May 9, 2013 (Dkt. 26).  On February 10, 2016, Defendant filed its motion for summary judgment.  (*See* Dkt. 93.)

*LEGAL STANDARD*

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52  (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  In ruling upon a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party, construing any disputed facts in the nonmoving party's favor.  *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski*, 613 F.3d at 340. Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The nonmoving party cannot avoid summary judgment simply by relying on "conclusory allegations or unsubstantiated speculation," but must instead "offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quotation marks omitted).  Nor is a mere "scintilla of evidence" in support of the nonmoving party sufficient;

rather, "there must be evidence on which the jury could reasonably find for the [nonmovant]."
*Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation marks omitted)
(alteration in original); *see also Anderson*, 477 U.S. at 248 (a dispute of fact must be "genuine"—
that is, "the [record] evidence [must be] such that a reasonable jury could return a verdict for the
nonmoving party."); *Miner v. Clinton Cty.*, 541 F.3d 464, 471 (2d Cir. 2008) (nonmoving party
must offer "some hard evidence showing that its version of the events is not wholly fanciful")
(quotation marks omitted). In other words, "the mere existence of *some* alleged factual dispute
between the parties will not defeat an otherwise properly supported motion for summary judgment
. . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

Summary judgment is available even in the context of employment discrimination claims,
"[w]hen no rational jury could find in favor of the nonmoving party because the evidence to
support its case is so slight, there is no genuine issue of material fact and a grant of summary
judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d
Cir. 1994). However, "an extra measure of caution" is warranted in employment discrimination
cases before granting summary judgment, particularly with respect to the consideration of
"circumstantial evidence," as "direct evidence of discriminatory intent is rare." *Holtz*, 258 F.3d
at 69. This is particularly true where "the merits [of a plaintiff's case] turn on a dispute as to the
employer's intent," since in such cases, "direct evidence of that intent will only rarely be
available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof
which, if believed, would show discrimination." *Holcomb v. Iona College*, 521 F.3d 130, 137
(2d Cir. 2008) (quotation marks omitted).

*DISCUSSION*

Plaintiff asserts a number of claims arising out of Title VII. (Dkt. 26 ¶¶ 3–4.) Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1). Title VII similarly prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful employment practice" by Title VII. *Id*. § 2000e-3(a).

While Plaintiff's SAC is inartfully drafted—*i.e.*, the SAC does not delineate specific causes of action and/or theories of liability, but rather just enumerates a hodgepodge of allegations—the Court construes the SAC as alleging the following theories of discrimination: first, Plaintiff was subjected to a hostile work environment on the basis of his Haitian national origin; second, Plaintiff was subjected to disparate treatment on the basis of his national origin; third, Plaintiff was retaliated against for engaging in the protected activity of complaining about the discriminatory treatment he suffered; and fourth, Defendant failed to promote Plaintiff as a result of his national origin.

I.    Hostile Work Environment

Plaintiff claims he was subjected to a hostile work environment, in violation of Title VII, from September 2010 through the end of his employment with Defendant. (Dkt. 26 ¶¶ 45–46.) Defendant argues that summary judgment should be granted on this claim for two reasons. First, Plaintiff failed to exhaust his administrative remedies with respect to a hostile work environment claim, and therefore the Court lacks jurisdiction to consider it. Second, even if Plaintiff exhausted his administrative remedies, his allegations and evidence fail to create a triable issue of fact that

such an environment existed.  (Def. Mot.[34] at 6–13.)

A.    Exhaustion of Administrative Remedies

Prior to bringing a Title VII claim in court, including a hostile work environment claim, a plaintiff must first file an administrative charge with the EEOC or the equivalent State agency within 300 days of the alleged discriminatory conduct.  42 U.S.C. § 2000e-5(e)(1); *Williams v. N.Y.C. Housing Auth.*, 458 F.3d 67, 69 (2d Cir. 2006).  The Court lacks jurisdiction over Title VII claims not included in the charge or not "reasonably related" thereto.  A claim is "reasonably related" if it "fall[s] within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."  *Deravin v. Kerik*, 335 F.3d 195, 200–01 (2d Cir. 2003) (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir. 2001)); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008) (claim is reasonably related where "factual allegations in the administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised").  The "reasonably related" inquiry should focus on "'the factual allegations made in the [EEOC] charge itself'" and on whether those allegations "gave [the EEOC] 'adequate notice to investigate'" the claims asserted in court.  *Williams*, 458 F.3d at 70 (quoting *Deravin*, 335 F.3d at 201–02).

Defendant contends that Plaintiff failed to exhaust his administrative remedies insofar as his administrative charge failed to put the EEOC on notice of his hostile work environment claim. (*See* Def. Mot. at 1, 6–9.)  The Court disagrees.  As Defendant's own cited case (Def. Mot. at 7–8) makes clear, "[h]ostile environment claims . . . [by] [t]heir very nature involve[] repeated conduct" such that the unlawful employment practice complained of "occurs over a series of days

---

[34] All citations to "Def. Mot." refer to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment.  (Dkt. 94.)

or perhaps years." *Mathirampuzha*, 548 F.3d at 77 (citation omitted). A review of Plaintiff's EEOC charge depicts precisely this kind of steady stream of alleged discriminatory conduct, about which Plaintiff complained to his superiors, but which they failed to address.

In his EEOC charge, Plaintiff states at the outset that he is "originally from Haiti," and that, after being hired as a housekeeping employee at BDDSO, he "became subjected to a lot of discrimination *from the supervisors* and other state employees at the facility." (Sansolo Decl. Ex. B at ECF 2 (emphasis added).) The charge goes on to describe a continuing course of allegedly discriminatory behavior to which his current claims of hostile work environment are clearly related, if not identical. For example, Plaintiff alleges that, while assigned to "building 2," he "felt that [his] safety was at risk due to the fact that [he] was verbally threaten[ed] by another housekeeping employee . . . that told [Plaintiff] that he was going to slap the hell out of [him]." The charge also claims that when Plaintiff "file[d] a work place violence [complaint]," his supervisors "handled the situation as if [Plaintiff] wasn't a victim," telling Plaintiff that he "probably was the one that said something" to the allegedly threatening employee and then "remov[ing] [Plaintiff] from the building and [taking] the other employee's side because [Plaintiff] was not part of their click [sic]." (*Id.*) According to the charge, Plaintiff was then transferred to a different building where he was "subjected to more discrimination," of which "the supervisors were [] aware," culminating with Plaintiff being "attacked . . . by the same individual." (*Id.* at ECF 2–3.) Plaintiff concludes by saying that the charge was meant "to let people know the discrimination *that foreigners go through*," asking whether it was "fair for someone to go through all this and not find one person in [the] facility that is able to even listen to [the] complaints and make a change," and stating that "it is not right for anyone to be treated this way regardless of [their] place of origin, race, skin color nor [sic] gender." (*Id.* at ECF 3.)

While somewhat garbled, the EEOC charge, which Plaintiff drafted *pro se*, describes a course of discriminatory conduct that Plaintiff believed was motivated by his status as a "foreigner," *i.e.*, Haitian, and his "origin, race, skin color . . . [and/or] gender." (*Id*.) And he further alleged that this conduct altered his conditions to the point that he feared physical harm and retaliation, especially because his supervisors knew about these conditions and failed to "even listen" and "make a change." (*Id*.) These factual allegations "gave the EEOC adequate notice to investigate" (*see* Def. Mot. at 7) Plaintiff's instant hostile work environment claim, such that this claim is reasonably related to Plaintiff's EEOC charge. The Court, therefore, finds that Plaintiff has exhausted his administrative remedies with respect to that claim.

B.  Liability for Hostile Work Environment

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted). A plaintiff may prevail on a hostile work environment claim by demonstrating that (1) his workplace was "permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment," and (2) there is a "specific basis" for imputing that conduct to the employer. *See id*. at 110 (quotation marks omitted) (alterations omitted)*; see also Perez v. Comms. Workers of Am.*, 210 F. App'x 27, 31 (2d Cir. 2006) (hostile work environment claim requires plaintiff to demonstrate that he suffered unwelcome harassment on the basis of his membership in a protected class, and that harassment was sufficiently severe or pervasive enough to alter the conditions of employment); *Miller v. McHugh*, 814 F. Supp. 2d 299, 314 (S.D.N.Y. 2011) (same). This test has both objective and subjective elements, meaning that the harassment must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and plaintiff himself must also

subjectively perceive the environment to be abusive. *See Terry v. Aschroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citations omitted).

The incidents at issue must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Das v. Consolidated School Dist. of New Britain*, 369 F. App'x 186, 190 (2d Cir. 2010); *see also Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) ("There is no fixed number of incidents that a plaintiff must endure . . . . [W]e view the circumstances in their totality, examining the nature, severity, and frequency of the conduct."). To determine whether a plaintiff has met his burden, "courts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (quotation marks omitted) (alterations omitted); *see also Feingold v. New York*, 366 F.3d 138, 149, 150 (2d Cir. 2004).

Here, Plaintiff has adduced sufficient evidence from which a reasonable juror could find that Plaintiff was subjected to discrimination on the basis of his Haitian national origin that was "sufficiently continuous and concerted . . . to be deemed pervasive." *See Das*, 369 F. App'x at 190. Within two months of being hired, Gilbert asked Plaintiff, within earshot of his supervisors, about his national origin and proceeded to make a discriminatory comment about Plaintiff being Haitian, while Plaintiff's supervisors listened and laughed. (Joseph Dep. at 87:24–88:20.) Thereafter, Plaintiff was subjected "[o]n a daily basis" to his supervisors and other co-workers calling him "Flag Boy" and other disparaging names based on his Haitian national origin. (*See, e.g.,* McClain Dep. at 134:13–135:14 (Plaintiff was subjected to, *e.g.*, his supervisor Nabors calling him "Flag Boy" or "that fucking Haitian" or "[t]hat Haitian nigger" whenever Nabors and

Plaintiff would walk past one another); *id*. at 136:14–137:21 (Norman would call Plaintiff "Flag Boy" but not as much as Nabors; he "was more of a laugh type of guy," as was Saroop, who would "join in with the laughing" when such comments were made*); see also* Larrieux Dep. at 43:18–44:6 (Gilbert "joined in with the other supervisors and other people on the floor . . . to call [Plaintiff] all type of names," such as "Voodoo Man," "Fucking Haitian," "Dirty Nasty Haitian," "Haitian faggot, Boat People, Flag Boy"); *id*. at 44:14–45:3 (Gilbert "had a serious hatred towards [Plaintiff]," demonstrated by him saying things like "'Fucking nasty Haitian,'" and Nabors would join in that conduct); *id*. at 49:2–8 (Saroop would call Plaintiff "Flag Boy," "Nasty Haitian," and "Dirty Haitian").)

A rational factfinder could similarly conclude that a reasonable employee in Plaintiff's position would have felt—as Plaintiff plainly did—that his work environment was hostile and abusive. *See Feingold*, 366 F.3d at 151 (evidence sufficient to meet both objective and subjective standard where the plaintiff adduced evidence demonstrating, *inter alia*, that "his colleagues' hostility prevented him from receiving proper training . . . [or] feedback or guidance" and the plaintiff declared in an affidavit that "the hostile treatment took a psychological toll on him, causing him to become depressed, to dread going to work, to seek a transfer, and to lose his desire to socialize with people in general"). Plaintiff has alleged that, in part on the basis of his Haitian national origin, he was subjected to verbal and physical abuse and was assigned a disproportionately heavy workload, such that he felt that "everybody that [was] not Haitian had better treatment than [him]" (Joseph Dep. at 68:18–21), and that he "was being treated unfairly" (*id*. at 74:12–17). Plaintiff testified that he felt "under threat all the time." (*Id*. at 97:4–12*; see also id*. at 126:14–24 ("How could you go to work every day, being called names and being ridiculed for doing hard work.").) Because of the discrimination he suffered, Plaintiff "felt like

[he] was lower than a dog," and that nobody "was going to even consider [him] as a full human being" by the time of the December 2011 physical altercation.  (*Id.* at 127:14–128:6.)  While Plaintiff complained about this conduct on numerous occasions, both to his supervisors and to Williamson, hoping to rectify the situation, "nobody wanted to come to [his] rescue, and [he] felt [his] job was on the line."  (*See id.* at 97:13–24 ("Every time [Plaintiff] had to make a formal complaint or oral complaint, it was never resolved.  Nothing was ever done on [his] behalf."); *id.* at 101:16–17 (Plaintiff felt "by [him]self, and always be[ing] criticized or being blamed for something").)

Moreover, the evidence adduced by Plaintiff is sufficient for a factfinder to conclude there is a specific basis to impute this discriminatory conduct to Defendant, as Plaintiff's employer, because the evidence demonstrates not only that Plaintiff's supervisors were aware of the discriminatory conduct, but that they did nothing to discourage or stop it and, in fact, actively participated in it.  *See Feingold*, 366 F.3d at 152 (where the plaintiff "provided evidence that both his immediate supervisor and the supervisor for the entire [department] were aware that he was experiencing a hostile work environment, yet neither took any action either to disapprove of or to remedy the situation," this was "sufficient . . . to permit a trier-of-fact to find a specific basis for imputing the discriminatory conduct to the [employer]").

In support of its motion for summary judgment on Plaintiff's hostile work environment claim, Defendant asks the Court to deem Plaintiff's version of events—the allegations in Plaintiff's SAC, Plaintiff's testimony, and the testimony of two corroborating witness, McClain and Larrieux—not credible.  The thrust of Defendant's argument appears to be that, because the full array of discriminatory conduct set forth in Plaintiff's SAC was not spelled out in his EEOC charge, in his original complaint, or before Judge Gleeson at oral argument on Defendant's initial

motion to dismiss, Plaintiff's claims now cannot be believed.[35]  In essence, Defendant's argument

is that if things were really as bad as Plaintiff now claims, he would have said so in the first place.

This argument fails, however, because it calls upon the Court to engage in credibility

determinations that are reserved for the jury.  "It is a settled rule that 'credibility assessments,

choices between conflicting versions of the events, and the weighing of evidence are matters for

the jury, not for the court on a motion for summary judgment.'"  *McClellan v. Smith*, 439 F.3d

137, 144 (2d Cir. 2006) (citation omitted) (alteration omitted)*; see also In re Fosamax Products*

*Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) ("[T]he general rule remains that 'a district

court may not discredit a witness's deposition testimony on a motion for summary judgment,

because the assessment of a witness's credibility is a function reserved for the jury.'") (citation

omitted); *Milfort v. Prevete*, 922 F. Supp. 2d 398, 406 (E.D.N.Y. 2013) ("[T]he credibility of

witnesses is not to be assessed by the court on a motion for summary judgment. . . .  Resolutions

of credibility conflicts and choices between conflicting versions of the facts are matters for the

jury, not for the court on summary judgment.") (quotation marks and citation omitted).  This

standard applies equally to Plaintiff's testimony and to the testimony of Plaintiff's corroborating

witnesses, McClain and Larrieux.

Defendant points to inconsistencies in Plaintiff's deposition testimony in support of its

argument for summary judgment, contending that Plaintiff "at one point alleg[es] a hostile work

environment created by his supervisors as early as 'a few weeks' after he started in September of

2010 . . . and later testif[ies] that the alleged harassment did not begin until after May 18, 2011,"

---

[35] The Court notes that, even at oral argument before Judge Gleeson, while Plaintiff's *pro se* testimony was at best a bit garbled, he did in fact clarify that his "supervisors are . . . not Haitian, they are African-Americans [and] . . . don't relate to [Plaintiff] . . . ." (Sansolo Decl. Ex. E at 31:10–17), which is, in part, the basis of his discrimination claims here.

while in his SAC, he alleges that "this treatment at the hands of his supervisors began at the inception of his employment." (*See* Def. Mot. at 11–12.) Defendant argues that "these inconsistencies, together with [Plaintiff's] failure to raise the allegations in his numerous prior complaints, [mean that] no reasonable juror would accept Plaintiff's claims." (*Id.*) In support of this argument, Defendant relies on the Second Circuit's decision in *Jeffreys*. (*See* Def. Mot. at 10–12; Def. Reply[36] at 5–6.) That decision does not avail Defendant here.

In *Jeffreys*, a plaintiff relied entirely on his own testimony—along with statements of two witnesses attesting only as to what the plaintiff had told them, rather than what they themselves had seen—to sustain an excessive force claim in which he alleged that police beat him to the point of unconsciousness and then threw him from a third-floor window, an allegation based not upon his recollection, but upon inference, since "he [did] not remember jumping out or falling while attempting to escape." *Jeffreys*, 426 F.3d at 551–52. Medical evidence, however, directly contradicted the plaintiff's claims that he had lost consciousness and had suffered head trauma. *Id.* at 552–53. This evidence, combined with three separate statements the plaintiff made within nine days of the incident, all indicating that he had jumped or attempted to flee out of the window, led the district court in *Jeffreys* to grant summary judgment in defendants' favor, because "'permitting [plaintiff] to present such incredulous testimony at trial would be a terrible waste of judicial resources and a fraud on the court.'" *Id.* The Second Circuit affirmed, holding that the district court did not err where it "found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" such that "no reasonable person could believe [plaintiff's] testimony." *Id.* at 555.

---

[36] All citations to "Def. Reply" refer to Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment. (Dkt. 106.)

Here, by contrast, as discussed above, Plaintiff's deposition testimony is largely consistent with the allegations in his SAC and substantially corroborated by the deposition testimony of McClain and Larrieux, as well as documentary evidence, such as the incident reports. (*See, e.g.*, Norman Decl. Ex. C (Gilbert admitted that the dryer door incident occurred, despite characterizing it differently than Plaintiff).) Although the depositions of Plaintiff, McLain, and Larrieux all contain inconsistencies with respect not only to dates of alleged discrimination, but also to the actors involved and Plaintiff's responses thereto, these inconsistencies are not so glaring that "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint." *Jeffreys*, 426 F.3d at 549. Rather, a consideration of these inconsistencies and a determination of their impact on the witnesses' credibility is a task better suited to a jury than to the Court on summary judgment.[37] This is particularly true here, where the Court is cognizant of the need for "caution about granting summary judgment to an

---

[37] The Court's conclusion is unaltered by Defendant's argument that McClain's and Larrieux's testimony is not credible because of internal inconsistencies and, as to Larrieux, time records proffered by Defendant which indicate she did not work on two days on which she testifies she witnessed firsthand some of the more egregious discriminatory conduct alleged. Larrieux contests the authenticity of these time records. (*See supra* n.20.) While Defendant might find that ludicrous, there is insufficient evidence in the record for the Court to conclude that such a challenge is wholly unsubstantiated without impermissibly treading upon the role of the jury. Defendant will have the opportunity to cross-examine these witnesses at trial regarding inconsistencies in their deposition testimony, including with respect to Larrieux's time records, but it must be "left for the jury to decide at trial" whether to "credit all of this proffered [testimony], some of it, or none at all." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 227 (2d Cir. 2014) (quotation marks and citation omitted).

The Court's conclusion is similarly unaltered by Defendant's argument that Plaintiff's proffer of Dr. Jaime Nieto, his treating surgeon—who "disavowed the conclusions . . . cited in Plaintiff's [expert disclosure]" regarding Plaintiff's back injury being caused by Gilbert's December 2011 attack—so erodes Plaintiff's credibility that no reasonable jury would believe him. (*See* Def. Mot. at 13.) As Defendant acknowledges, Dr. Nieto is offered "to support [Plaintiff's] claims for *damages*," (*id.* (emphasis added)), and the Court therefore sees no relevance of Dr. Nieto's testimony with respect to determining the viability of Plaintiff's claim as to Defendant's *liability* for the alleged Title VII violations.

employer in a discrimination case" and to "carefully scrutinize[]" deposition testimony such as the testimony Defendant would have the Court reject wholesale. *See Holcomb*, 521 F.3d at 137.

The Court therefore denies Defendant's motion for summary judgment as to Plaintiff's hostile work environment claim.

II.     Disparate Treatment

Plaintiff also alleges he was discriminated against on the basis of his Haitian national origin because he was treated less favorably than his non-Haitian co-workers in the terms and conditions of his employment. To succeed on such a disparate treatment claim, a plaintiff must meet the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* (*McDonnell Douglas*), 411 U.S. 792, 802–05 (1973).

First, a plaintiff must establish a *prima facie* case of discrimination. *Id.* at 802; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). The plaintiff's burden at this first step is "not onerous," *Tex. Dep't of Cmty. Affairs v. Burdine* (*Burdine*), 450 U.S. 248, 253 (1981), and "minimal," at best, *St. Mary's Honor Ctr. v. Hicks* (*Hicks*), 509 U.S. 502, 506 (1993). To establish a *prima facie* case, a plaintiff must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) that such an adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Feingold*, 366 F.3d at 152 (citing *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)).

Second, once the plaintiff has established a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its adverse employment decision, which, if established, rebuts the "presumption" of employment discrimination created by the plaintiff's *prima facie* case. *Burdine*, 450 U.S. at 253, 255 (quotations omitted); *see also*

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("After a plaintiff demonstrates a *prima facie* case of [] discrimination, the defendant must produce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.") (quotation marks omitted) (emphasis in original); *Hicks*, 509 U.S. at 506–07 (describing the "presumption" as a "conclusion [of employment discrimination] in the absence of explanation," which the defendant's "explanation" rebuts).

Third, the plaintiff must bear the entire burden of proving that the defendant's non-discriminatory reason was mere "pretext for discrimination," thus establishing that he was, in fact, discriminated against. *Burdine*, 450 U.S. at 253, 256. The plaintiff need only prove that his protected characteristic was a "motivating factor" that contributed to the adverse employment decision, even if it was not a determinative factor. *Desert Palace, Inc. v. Costa* (*Costa*), 539 U.S. 90, 94 (2003) (quoting 42 U.S.C. § 2000e-2(m)).[38]

Defendant does not dispute the first two elements of Plaintiff's *prima facie* case—that Plaintiff is a member of a protected class based on his Haitian national origin and that he was qualified for the position he held—but contends that Plaintiff has not demonstrated the third and fourth elements—that he suffered an adverse employment action and that any alleged adverse employment action occurred under circumstances giving rise to an inference of discrimination. (*See, e.g.*, Def. Mot. at 1.)

The Second Circuit has made clear that an adverse employment action is a "materially adverse change in the terms and conditions of employment," *Mathirampuzha*, 548 F.3d at 78,

---

[38] Though the defendant may prove, as a "limited affirmative defense" to mitigate damages, that it "'would have taken the same action in the absence of the impermissible motivating factor[,]'" *Costa*, 539 U.S. at 94–95 & n.2 (quoting 42 U.S.C. § 2000e-5(g)(2)(B)), proof of this affirmative defense does not, in itself, establish defendant's entitlement to summary judgment on liability.

meaning something more disruptive than a mere inconvenience or an alteration of job responsibilities, such as termination, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a given situation, *Feingold*, 366 F.3d at 152. An adverse employment action can be shown to have occurred under circumstances giving rise to an inference of discrimination through evidence of, *inter alia*, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (quotation marks omitted).

Where, as here, a plaintiff relies on disparate treatment evidence to raise an inference of discrimination, he "must show [that he] was similarly situated in all material respects to the individuals with whom []he seeks to compare [him]self." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *see also Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (while "a showing of disparate treatment 'is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case,'" a plaintiff must "show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group").

In his opposition to summary judgment, Plaintiff asserts a number of purported adverse employment actions,[39] each of which he alleges occurred under circumstances giving rise to an

---

[39] Plaintiff enumerates nine specific instances of "adverse treatment" (*see* Pl. Opp. at ECF 22–24), as well as a number of additional events which Plaintiff argues should be "taken as a whole" rather than "taken individually" in considering his disparate treatment claim (*id*. at ECF 24 n.14). Because there is extensive overlap between these nine instances—*i.e.*, Plaintiff was "given [an] excessive workload" and was "forced to work extra hours" and had an "increased

inference of discrimination:  (1) perpetuating and condoning a hostile work environment as to Plaintiff that included his supervisors and co-workers making derogatory comments to him about his Haitian national origin, a non-Haitian, African-American co-worker (Gilbert) verbally threatening Plaintiff, and his supervisors inciting Gilbert to physically attack Plaintiff; (2) treating Plaintiff, and not Gilbert, as the aggressor in both the verbal and physical workplace violence incidents and transferring Plaintiff, rather than Gilbert, to a facility where he had an increased workload that was designed to exacerbate the injury he sustained from the attack; (3) assigning Plaintiff an excessive workload compared to his non-Haitian, African-American co-workers, including forcing him to work extra hours and repeat work he had already completed; (4) denying Plaintiff breaks while non-Haitian, African-American co-workers were permitted protracted breaks; (5) failing to pay Plaintiff extra time and hazard pay, or paying it late, while his non-Haitian, African-American co-workers received their extra time and hazard pay timely; (6) denying Plaintiff health insurance when non-Haitian, African-American co-workers received health insurance; (7) delaying the processing of Plaintiff's direct deposit application; and (8) forcing Plaintiff to work a longer probationary period than non-Haitian, African-American co-workers.

A.    Hostile Work Environment

Plaintiff contends that his supervisors and co-workers making derogatory comments about Plaintiff's Haitian national origin, permitting Gilbert to verbally threaten Plaintiff, and inciting Gilbert to physically attack Plaintiff all constitute adverse employment actions sufficient to

workload"; Plaintiff was "labeled the aggressor" when he was threatened by a non-Haitian co-worker and Defendant "blamed the Haitian plaintiff as being the aggressor and transferred him"— the Court has re-organized them into eight distinct and separate categories. (*See* Pl. Opp. at ECF 22–24 & n.14.)

sustain his *prima facie* case. The Court construes this as a rearticulation of Plaintiff's hostile work environment claim, which itself is sufficient to sustain his disparate treatment claim. *See, e.g., Feingold*, 366 F.3d at 149 ("A plaintiff may establish a claim of disparate treatment under Title VII by demonstrating that harassment on [the basis of, *inter alia*, his national origin] amounted to a hostile work environment."). As discussed *supra*, the Court has determined that Plaintiff has adduced enough evidence to permit a rational factfinder to conclude that Plaintiff was subjected to a hostile work environment and therefore Plaintiff's disparate treatment claim may proceed on this basis.

B. <u>Disproportionate Workload</u>

Plaintiff contends that he was "given [an] excessive workload compared to his African American counterparts," which included "single-handedly carry[ing] on the job of four men," being "forced to work extra hours," and being "ordered to clean certain facilities two times as a form of abuse." (Pl. Opp. at ECF 22–23.) Defendant argues, inappositely, that "[g]iving preferential treatment with respect to work assignments to others outside of the plaintiff's protected class does not constitute an adverse employment action where the plaintiff did not otherwise suffer a demotion, material loss of benefits, or significantly diminished material responsibilities." (Def. Mot. at 19.) Defendant also contends that Plaintiff has failed to establish an inference of discrimination with respect to any increased workload, because "Plaintiff's claim[] that his supervisors used racial epithets is not credible," and "[w]ithout such evidence, the record is devoid of evidence of discriminatory intent." (*Id*. at 20.) The Court disagrees on both counts.

"[T]he assignment of a disproportionately heavy workload," in itself, may constitute an adverse action. *See Feingold*, 366 F.3d at 153. Here, Plaintiff has adduced sufficient evidence

to permit a rational factfinder to conclude that Plaintiff was consistently assigned disproportionately more work than his non-Haitian, African-American co-workers. For example, Larrieux testified that Plaintiff would be assigned to a job involving "a lot of carrying heavy duty stuff and waxing the floors," to which typically "two or three people" would be assigned. (*See* Larrieux Dep. at 97:25–98:21; *see also id.* at 101:9–102:2 ("from what [Larrieux] observed for years . . . the type of work that [Plaintiff] was doing was extra work than the other people that [she] witnessed working," work such as waxing, moving furniture, and cleaning extra rooms, and Plaintiff "used to do all that by himself").) McClain similarly testified about Plaintiff being assigned a disproportionate amount of work, *i.e.*, Plaintiff was assigned to clean "a wing by himself," which typically required "at least three people," while his African-American co-workers were "[c]hilling," "[w]alking around," "[s]moking weed in the parking lot," rather than working. (McClain Dep. at 146:23–148:9; *see also id.* at 18:8–20 ("doing the floors," meaning "strip[ping] the floor with wax, tak[ing] the wax off . . . and then com[ing] behind it and put[ting] new wax on," "usually requires a team" of "[a]t least three"); *id.* at 108:11–21 (McClain saw Plaintiff "scrubbing the [] floors" in a job "that takes two people to do" while Nabors and a man named Pierre[40] were "standing over him while he was working").) This type of treatment qualifies as an adverse employment action.

Plaintiff has similarly submitted sufficient evidence to permit a trier-of-fact to conclude that this adverse employment action occurred under circumstances giving rise to an inference of discrimination. As discussed, Plaintiff has put forth evidence that he was subjected to persistent

---

[40] The record reflects that there were at least two individuals named Pierre working for Defendant, both of whom appear to be Haitian. (*See* McClain Dep. at 48:17–21, 95:19–96:2.) It is unclear which of the two Pierres McClain was referring to, but McClain testified that one Pierre—the supervisor—"would follow what the instructions were from [Nabors]." (*Id.* at 144:4–17.)

derogatory comments about his Haitian ancestry by his supervisors and/or by co-workers and that his supervisors knew of, but failed to take any action to prevent or correct, this conduct. (*See, e.g.*, Joseph Dep. at 77:18–78:15 (when Plaintiff asked why Nabors was targeting him after Nabors ordered him to clean an area for a second time after Plaintiff had just finished cleaning it, Nabors responded, "'I don't like freaking Haitians'").)

The Court has already rejected Defendant's argument that the Court should discredit Plaintiff's testimony regarding his supervisors' and co-workers' use of racial epithets towards him. *See supra* pp.35–38. Rather than offer a legitimate, non-discriminatory reason for this adverse employment action, Defendant categorically denies that Plaintiff was ever subjected to a disproportionate workload. (*See, e.g.*, Dep. 56.1 ¶¶ 14, 33, 41.) The Court, however, finds that the evidence proffered by Plaintiff puts this issue in dispute. For this reason, Plaintiff shall be permitted to proceed to trial on his disparate treatment claim based on a disproportionately heavy workload. *See, e.g., Castro v. Mitchell*, No. 09 Civ. 3754, 2011 U.S. Dist. LEXIS 101263, at *12–14 (S.D.N.Y. Aug. 25, 2011) (denying summary judgment on plaintiff's Title VII discrimination claim where the plaintiff's testimony "indicate[d] that . . . he was consistently assigned disproportionately more of these [work] tasks than his coworkers," and evidence indicated that a supervisory employee had made at least one derogatory comment contemporaneously with the assignment of such tasks).

C.   Response to Workplace Violence and Transfers

Plaintiff also contends that, as a result of two workplace violence complaints, he was labeled the aggressor and transferred to other facilities where his workload increased. (Pl. Opp. at ECF 23.) Defendant contends that Plaintiff's transfers do not constitute adverse employment actions because they were not "materially adverse," in that they did not result in any change to

the terms and conditions of Plaintiff's employment, and that, in any event, Plaintiff cannot demonstrate that the response to either workplace violence complaint occurred under circumstances giving rise to an inference of discrimination. (Def. Mot. at 17–18.)

Workplace reprimands/disciplinary write-ups and lateral job transfers do not constitute adverse employment actions unless they result in a material change in benefits or to the terms and conditions of employment. *See, e.g., Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010) ("A lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse."); *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234, 2014 U.S. Dist. LEXIS 155565, at *71 (E.D.N.Y. Nov. 3, 2014) ("The disciplinary write-ups [plaintiff] received . . . were not adverse employment actions because he never lost any material benefits as a result."); *Honey v. Cty. of Rockland*, 200 F. Supp. 2d 311, 320 (2002) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.") (collecting cases). However, as noted above, a disproportionately heavy workload *can* constitute an adverse employment action. *See Feingold*, 366 F.3d at 153. Therefore, a jury could find that Plaintiff's transfers in April and December 2011 constituted adverse employment actions to the extent they resulted in Plaintiff having to bear a disproportionately heavy workload above that which he already bore. This was the case with the December 2011 transfer, but not with the April 2011 transfer.

### 1.    April 2011 Complaint and Transfer

The record is devoid of evidence that Plaintiff's already disproportionate workload increased after his April 2011 complaint and subsequent transfer from Building #2 to Building

#5.  The only evidence that arguably shows this is the wholly nonspecific testimony of Plaintiff's corroborating witnesses, that whenever Plaintiff complained about his discriminatory treatment, he was subjected to an increased workload.  (*See* Larrieux Dep. at 100:21–101:18 ("When [Plaintiff] complained to [his supervisors], it got even worse . . . [t]hey were giving him a harder time," giving him "extra work than the other people that [she] witnessed working"); McClain Dep. at 115:25–117:7 (Plaintiff would tell McClain that he had complained to human resources and personnel about harassment, and after these alleged complaints, McClain witnessed the workload get heavier, in that he would not get help for jobs requiring multiple people).)

Indeed, Plaintiff's own opposition papers indicate that Plaintiff's workload only increased after his December 2011 transfer to Shirtz 2.  (*Compare* Pl. Opp. at ECF 23 ("When plaintiff was threatened by Gilbert (African American), plaintiff would be labeled the aggressor and transferred (in April 2011 and again in December 2011)), *with id.* at ECF 23–24 (Defendant "transferred plaintiff . . . to Shirtz 2[] where defendant increased plaintiff's workload and where he had no one to assist him. . . . [such that] [t]his was an employment action that materially changed the terms and conditions of plaintiff's employment and was more than a mere inconvenience.").)  *See Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (quotation marks omitted).  Accordingly, Plaintiff's disproportionate workload claim cannot be based on his April 2011 transfer.[41]

_____

[41] Even if Plaintiff's evidence were sufficient to establish that his April 2011 transfer resulted in an increased workload, Defendant has proffered a legitimate, non-discriminatory reason therefor, which Plaintiff has not rebutted.  *See Carlton*, 202 F.3d at 136.  Defendant contends, *inter alia*, that Gilbert "had documented problems with the supervisor in Building 5." (Def. Mot. at 18; Nabors Decl. ¶ 16.)  This presents a legitimate, non-discriminatory reason for

2.    December 2011 Complaint and Transfer

Plaintiff has, however, established a *prima facie* case with respect to the December 2011 incident and his subsequent transfer from Building #5 to Shirtz 2. The record evidence indicates that the transfer to Shirtz 2 resulted in an increased workload sufficient to render the transfer an adverse employment action. (*See* Joseph Dep. at 110:4–13 (after the transfer to Shirtz 2, Plaintiff's work "not only got doubled, it got tripled," and there was "no staff there to help [Plaintiff] out[,] [he] was pretty much doing everything on [his] own"); *id*. at 117:8–23 (his supervisors remained the same in Shirtz 2; "nothing else changed but [his] location" and his "workload got tripled"); *id*. at 128:7–17 (same); *see also* McClain Dep. at 142:16–143:7 (Shirtz 2 has a "heavier [work]load" than in Defendant's other facilities, "because only one person works the whole building" and "[t]here is no help over there.").)

Moreover, the record evidence would permit a factfinder to conclude that Plaintiff's transfer to Shirtz 2 occurred under circumstances giving rise to an inference of discrimination, since McClain testified that she heard two of Plaintiff's supervisors, in the aftermath of the December 2011 incident, discussing "'put[ting] [Plaintiff] in Shirtz,'" because "'[t]he fucking Haitian won't be able to do the job . . . He is either going to quit or we are going to have to fire him.'" (McClain Dep. at 141:15–142:10; *see also id*. at 56:18–57:24 (in the same conversation, Nabors informed Norman that he had fixed the dryer so "'[n]obody is going to believe Jimmy'" and when Norman asked what they were going to do with Plaintiff, Nabors allegedly responded, "'we can send him to Shirtz . . . Either he won't be able to do the work and he will quit or we have to fire him because he is not doing the work properly.'"); *id*. at 127:25–128:12 (same).)

---

Plaintiff's transfer to Building #5, which Plaintiff has made no attempt to rebut as merely pretextual. *See Burdine*, 450 U.S. at 256 (plaintiff must bear the entire burden of proving that the defendant's nondiscriminatory reasons were mere "pretext for discrimination").

Defendant has offered a reason for the transfer, namely that Plaintiff agreed to the transfer after "verbally threatening . . . [a] coworker [Gilbert]" in front of Norman and a personnel department employee. (*See* Def. Mot. at 18.) Defendant proffers Norman's declaration in support of this explanation for Plaintiff's purported agreement to the transfer: Plaintiff "stated that he didn't know what he would do if he encountered John Gilbert again at work," the implication being that Plaintiff was concerned that he would become violent toward Gilbert. (Norman Decl. ¶ 17). Norman goes on to state that "[a]s a result of this threat, it was decided that [Plaintiff] should be reassigned so he would no longer have any interaction with John Gilbert." (*Id*.) While there is reason to doubt the veracity of this explanation[42]—seemingly made for the first time in connection with this litigation—because it is not the Court's role to assess credibility, it accepts this assertion as true and finds it sufficient to state a non-discriminatory reason for the December 2011 transfer.

Turning to the third step in the *McDonnell Douglas* analysis, the Court finds that Plaintiff has proffered sufficient evidence for a rational factfinder to infer that Defendant's non-discriminatory reason for transferring Plaintiff in December 2011 was merely pretextual. While "[t]he burden of establishing [] pretext is higher than that required to establish a prima facie case of discrimination[,] . . . it is well-settled that a Title VII plaintiff may rely on the same evidence

---

[42] Defendant's explanation for the December 2011 transfer makes no sense. Plaintiff had already been transferred from Building #2 to Building #5, specifically to keep him and Gilbert apart after the April 2011 incident between Plaintiff and Gilbert. (*See, e.g.,* Nabors Decl. ¶ 14 (after the April 2011 incident, Nabors told Plaintiff "to avoid John Gilbert until [Plaintiff] could be reassigned to another location to avoid any further confrontation"), ¶ 16 ("Following [Plaintiff's] complaint on April 21, 2011, he was transferred to Building # 5 *to separate him from John Gilbert*.") (emphasis added).) Thus, transferring Plaintiff to yet another building was unnecessary if the purpose was to separate them or keep them separated; they were already separated. Furthermore, transferring Plaintiff again would not necessarily achieve the desired separation—and certainly not with any greater assurance—since the December 2011 incident arose when Gilbert was in Plaintiff's building, despite not being assigned to work there.

to establish pretext as he used to support his prima facie case." *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 328 (E.D.N.Y. 2015); *see also Kerzer v. Kingly Mfg.*, 156 F.3d 396, 402 (2d Cir. 1998) (same). Here, the evidence upon which Plaintiff relies to establish his *prima facie* case—his supervisors' comments about transferring him to Shirtz 2 because "'[t]he fucking Haitian won't be able to do the job . . . He is either going to quit or we are going to have to fire him'" (*see, e.g.*, McClain Dep. at 141:15–142:10)—is sufficient for a rational factfinder to conclude that Defendant's stated reason was pretextual. Therefore, Plaintiff will be permitted to proceed with his disparate treatment claim on the basis of having been transferred to Shirtz 2 after the December 2011 incident.

D.  Denial of Breaks

Plaintiff contends that he was frequently denied breaks during his workday, while his non-Haitian, African-American co-workers constantly received breaks. As an initial matter, Plaintiff has failed to establish that this constitutes an adverse employment action, insofar as the denial of breaks, distinct from a disproportionately heavy workload,[43] does not "materially impact the terms and conditions of his employment comparable to termination, demotion, or decreased wages," and thus more closely resembles a mere inconvenience. *See Castro*, 2011 U.S. Dist. LEXIS 101263, at *12. This is particularly true in light of Plaintiff's testimony that he was "never given breaks from the time [he] got on the job" (Joseph Dep. at 75:19–22), meaning that even prior to his supervisors finding out he was Haitian on November 29, 2010 (*see* Pl. Opp. 56.1 ¶ 11). Plaintiff, therefore, cannot demonstrate that any denial of breaks constituted a material adverse *change* in the terms and conditions of Plaintiff's employment occurring under

---

[43] The Court views Plaintiff's argument regarding the denial of breaks as separate and distinct from his claim of being forced to bear a greater workload than his non-Haitian, African-American co-workers, which the Court has addressed, *supra*.

circumstances giving rise to an inference of discrimination.

For these reasons, Plaintiff will not be permitted to pursue his discrimination claim on the basis of his alleged denial of breaks.

E.       Extra Time and Hazard Pay

Plaintiff claims he suffered an adverse employment action in that Defendant failed to pay him hazard and extra time[44] pay to which he was entitled, or that Defendant paid him these wages late, while his African-American co-workers were given this pay without delay.  (*See* Pl. Opp. at ECF 23.)   The loss of pay on the basis of a protected characteristic violates Title VII.  *See Robinson v. Goulet*, 525 F. App'x 28, 31 (2d Cir. 2013) (summary order); *see also Sethi v. Narod*, 12 F. Supp. 3d 505, 528 (E.D.N.Y. 2014).   Here, however, Plaintiff has not demonstrated any such loss.

Plaintiff concedes that he does not know the periods of time or how many extra hours he worked for which he was not compensated.  (*See* Def. 56.1 ¶¶ 92–93.)  While he disputes the fact that he was paid for all extra time that he was owed, he cites no evidence to place this fact in dispute.  (*Compare* Def. 56.1 ¶ 91, *with* Pl. Opp. 56.1 ¶ 91.)  Similarly, with respect to hazard duty pay, Plaintiff does not dispute that he was paid $541.50 in hazard pay based on having worked a total of 722 hours.  (*See* Def. 56.1 ¶¶ 94–99.)  Nevertheless, Plaintiff claims that he was not paid all hazard duty pay he was owed.  (*Compare* Def. 56.1 ¶¶ 100–02, *with* Pl. Opp. 56.1 ¶¶

---

[44] This was referred to in the record both as extra time and overtime.  Given Plaintiff's part-time employment status in which he was meant to work four-hour shifts (Joseph Dep. at 20:19–24) and, to the extent he worked more than that, it was between "[t]wo to four hours extra" (*id.* at 24:8–18), the Court presumes that this was payment for extra time that Plaintiff worked, rather than overtime premiums for hours worked over 40 in a workweek.  (*See* Def. 56.1 ¶ 90 (extra time is voluntarily offered to Defendant's part-time employees to work more than their scheduled hours each week, and these hours are compensated two pay periods later).)  In any event, the distinction is immaterial to the Court's decision.

100–02 (citing Joseph Dep. at 25).)

The sole evidence Plaintiff has adduced to support this claim, however, is his own vague, conclusory deposition testimony that he only "[s]ometimes" was paid hazard and extra time pay and that on one occasion his "pay got played with," meaning he "lost a lot of paychecks." (Joseph Dep. at 25:14–21 (Plaintiff's "overtime pay and [] hazardous pay weren't given to [him] on [his] paychecks, was missing from [his] paychecks"); *id.* at 129:25–130:17 (when Plaintiff was transferred to Shirtz 2, he "couldn't keep track of [his] money" and "[t]here was a lot of time that wasn't given to [him]," but when he complained to Norman "[s]ometime in January 2012," Norman told Plaintiff he would "look into [it]" but Plaintiff never heard back from him).) This is insufficient at the summary judgment stage to sustain his disparate treatment claim, particularly in light of the undisputed record evidence that Plaintiff was paid for the hours he worked. (*See* Diminich Decl.[45] ¶¶ 15–22 & Exs. H, J, K.) Plaintiff has not contested the accuracy of Defendant's time records or argued in opposition to summary judgment that these records do not reflect additional time for which Plaintiff was not compensated. Indeed, Plaintiff himself testified that, while it took "a lot of trying" and would sometimes "take[] month[s] . . . [t]o receive the checks," Plaintiff "eventually receive[d] all of the pay that was due to [him] by [Defendant]." (*See* Joseph Dep. at 25:22–26:6.) Therefore, to the extent there was any delay in Plaintiff's compensation, it appears to have been a "mere inconvenience," rather than an adverse employment action, and therefore Defendant's alleged failure to pay Plaintiff hazard or extra time pay cannot form the basis for Plaintiff's disparate treatment claim in this case.[46]

---

[45] All citations to "Diminich Decl." refer to the Declaration of John Diminich in support of Defendant's motion for summary judgment. (Dkt. 102.)

[46] Moreover, even to the extent the delay in payment itself could constitute an adverse employment action, Plaintiff has not met his burden of establishing that the delay occurred under

F.    Health Insurance

Plaintiff contends that he was denied health insurance benefits and that this constitutes an adverse employment action occurring under circumstances permitting an inference of discrimination, in that similarly situated employees received their health insurance benefits and card with no delay.  (*See* Pl. Opp. at ECF 24 n.14.)[47]

According to Defendant, Plaintiff was provided all of the necessary information to apply for State health benefits shortly after being hired but elected not to apply until approximately one year after he was hired, at which point he was given the necessary forms to enroll and was instructed as to what documentation he would need to provide, *i.e.*, birth certificate and social security card.  (Def. 56.1 ¶¶ 68–71.)  Defendant claims that Plaintiff's insurance became effective on September 20, 2012.  (*Id.* ¶ 75.)   Plaintiff disputes this, citing only his own deposition testimony to contend that he submitted the required forms countless times but did not receive his insurance card until July 2013.  (Pl. Opp. 56.1 ¶¶ 68–71 (citing Joseph Dep. at 140–46).)  Plaintiff

---

circumstances permitting an inference of discrimination.  He does not specify who in Defendant's payroll department was responsible for his check, nor does he provide any link between that payroll department employee and any discriminatory animus, or any link between that employee and any of the actors responsible for the other discriminatory conduct he alleges, *i.e.*, his supervisors, Norman, Nabors, and Saroop, or his co-workers, including Gilbert.  And while he tries to establish an inference of discrimination through disparate treatment evidence—by claiming that no African-American co-workers were subjected to any deprivations of or delays in compensation (*see, e.g.,* Pl. Opp. at ECF 7 & 23)—he provides no evidence of this assertion, let alone the requisite showing that individuals who were similarly situated in all material respects were treated differently with respect to the amount and/or timeliness of their pay.  *See Mandell*, 316 F.3d at 379; *see also Raspardo*, 770 F.3d at 126.

[47] Although Plaintiff frames his claim as one involving the "denial" of health care benefits, it is more properly characterized as alleging a delay in receiving these benefits, since the evidence shows that Plaintiff, in fact, received health insurance.  (*Compare* Def. 56.1 ¶ 75 (Plaintiff's insurance became effective on September 20, 2012), *with* Pl. Opp. 56.1 ¶ 75 (citing Plaintiff's deposition testimony to assert that Plaintiff only received his insurance card in July 2013).)  As discussed *infra*, however, the distinction is immaterial to the Court's analysis of this claim.

does not dispute that he provided the necessary insurance documentation to enroll in the State insurance plan on July 23, 2012, that his request was processed on August 3, 2012, or that there is a 56-day waiting period between when a request for health insurance is processed and when the benefits become active. (*See* Def. 56. 1 ¶¶ 72–74.)

According to Plaintiff, he and his non-Haitian, African-American co-worker Glover were called into personnel to apply for medical benefits on the same day, and while Glover received medical benefits and his insurance card after 30 days on the job, Plaintiff never received his. (Joseph Dep. at 140:11–141:3.) Plaintiff contends that another non-Haitian African-American co-worker, Harris, also got his medical benefits timely, while Plaintiff did not. (*Id*. at 146:17–147:3 (Plaintiff had "seen proof of . . . Robert Glover's card".).)[48] Plaintiff testified that he spoke with two women in the personnel department—Sheila Hall and a secretary named Yvette, whose last name Plaintiff did not know—to rectify the problem, and both women repeatedly told Plaintiff he needed to apply for insurance again. (*Id*. at 140:11–141:3, 147:8–22*; see also id*. at 142:6–21 ("Every time [Plaintiff] went back to personnel . . . [he] always had to reapply and file some paperwork," though he alleges that "[e]very form that was needed at the time, [he] did complete.").) Plaintiff alleges that he did not receive confirmation of insurance coverage until summer of 2013. (*Id*. at 144:15–24, 146:2–9.)

The Court need not determine whether this alleged denial or delay in obtaining insurance coverage constituted an adverse employment action, because Plaintiff has not adduced sufficient

---

[48] While the Court need not determine the sufficiency of Plaintiff's disparate treatment evidence, it notes that Plaintiff's claim regarding health insurance benefits would likely fail in this regard, as well, because Plaintiff has not demonstrated that Glover and Harris were similarly situated to him in all material respects, *e.g.*, that they, too, failed to provide some form of required documentation in connection with applying for these benefits, but nevertheless received benefits in a timely manner. *See Mandell*, 316 F.3d at 379; *see also Raspardo*, 770 F.3d at 126.

evidence to establish his *prima facie* case that it occurred under circumstances giving rise to an inference of discrimination. There is no indication that Hall or anyone else in the personnel department acted with any discriminatory animus, or that there existed any link between that individual and any of the actors responsible for the other discriminatory conduct he alleges, *i.e.*, his supervisors, Norman, Nabors, and Saroop, or his co-workers, including Gilbert. Indeed, the sole evidence in the record that purports to connect Plaintiff's denial of, or delay in receiving, health insurance and Defendant's alleged discrimination is the following:

> Q. Did Sheila Hall ever make any comments with regard to your ethnicity when you went to speak with her?
>
> A. After a while, it was obvious that she was . . . part of it, too. She did not say anything directly to me. She would be telling me the things she heard about me. Such as oh, I heard you being bad now. Or I heard you causing problems.
> . . .
> Her concerns were, if you are being bad, why should I help? That is how she looked at me after that point. . . .
> . . .
>
> Q. What did she say she heard?
>
> A. That I was bad.
>
> Q. Did she elaborate?
>
> A. She didn't elaborate . . . .

(Joseph Dep. at 142: 22–143:18.) This conclusory testimony, unsupported by any other evidence in the record, is insufficient at this stage of the proceedings to support Plaintiff's *prima facie* case.

Moreover, were the Court to find Plaintiff had established his *prima facie* case, the Court would nevertheless reject health insurance as a basis for Plaintiff's discrimination claim, as Defendant has proffered evidence of a legitimate, non-discriminatory reason for the alleged denial of, or delay in Plaintiff receiving, health insurance, *Carlton*, 202 F.3d at 136, and Plaintiff has not

met his burden to prove that that reason was mere "pretext for discrimination," *Burdine*, 450 U.S. at 253, 256. Defendant's evidence shows that Plaintiff did not elect to enroll in Defendant's insurance until December 2011, and then did not provide the necessary insurance documentation for enrollment until July 23, 2012. (*See* Leon Decl. ¶¶ 3–5.) Plaintiff's sole response to this is that "[e]very form that was needed at the time, [he] did complete." (Joseph Dep. at 142:9–13.) This is insufficient to establish that Defendant's legitimate, non-discriminatory reason was pretextual. *See Geras*, 149 F. Supp. 3d at 328–29 ("The burden of establishing [] pretext is higher than that required to establish a prima facie case of discrimination . . . ."); *see also Kerzer*, 156 F.3d at 402. Indeed, Plaintiff's testimony does not address the timing of his completion or submission of the forms or whether he submitted the additional documentation Defendant contends it requested.

For these reasons, the Court rejects Plaintiff's assertion of the deprivation of, and/or delay in receiving, health insurance benefits as a basis for Plaintiff's disparate treatment claim.

G.    Direct Deposit Application

The Court need not determine whether a delay in processing Plaintiff's direct deposit application constitutes an adverse employment action, as there exists no evidence in the record that would permit the Court to determine that any such delay occurred under circumstances giving rise to an inference of discrimination. The only evidence Plaintiff has adduced on this claim is his own vague, conclusory deposition testimony that "[w]hen [he] was in the job, from day one, [he] was denied everything . . . , including [the] mishandl[ing] of [his] money, [his] direct deposit slip." (Joseph Dep. at 127:23–128:6.) The evidence in the record establishes, however, that the delay in processing Plaintiff's payroll application resulted from Plaintiff having misidentified the bank's routing number on a payroll direct deposit form he submitted to Defendant on November

16, 2011.  (*Compare* Def. 56.1 ¶¶ 76–77 (Plaintiff's November 16, 2011 payroll direct deposit form misidentified his bank's routing number), *with* Pl. Opp. 56.1 ¶¶ 76–77 (conceding that he submitted the form, but disputing that the bank's routing number was misidentified, with no citation to evidence).)

Indeed, Plaintiff concedes that as a result of the misidentified routing number, the routing number was entered incorrectly into Defendant's payroll system on November 25, 2011, resulting in a return of Plaintiff's December 15, 2011 paycheck.  (*See* Def. 56.1 ¶¶ 78–79.)  Plaintiff concedes further that, as of December 16, 2011, the routing number error was corrected such that all Plaintiff's subsequent payroll checks were directly deposited into his bank account, and that he received all sums due to him as a result of this error by December 29, 2011.  (*Id.* ¶¶ 80–84.)  In light of this, Plaintiff has failed to establish his *prima facie* case that he suffered an adverse employment action based on the delay in processing his direct deposit application.

H.     Length of Probationary Period

Plaintiff has not established that he suffered an adverse employment action related to his probationary period.  Plaintiff argues that he was subjected to discrimination because he was forced to serve a full one-year probationary period while non-Haitian, African-American co-workers were not, and because, while he actually passed probation within the allotted one-year period, his supervisors lied to him and told him that he had failed.  Neither of these arguments is supported by the evidence.

It is undisputed that Defendant's policy was that all new housekeeping employees served a one-year probationary period, after which, depending on the level of satisfaction with their work, their probationary period could be extended or they could be terminated.  (Def. 56.1 ¶ 15.)  It is similarly undisputed that Plaintiff passed probation within exactly one year.  (*Id.* ¶¶ 16–17.)

The fact that Defendant subjected Plaintiff to Defendant's standard policy is not an adverse employment action. *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting [] policies in a reasonable manner."). Nor does it constitute an adverse employment action that Plaintiff's supervisors lied to him about having failed probation, as there is no record evidence that this effected any "materially adverse change," or any change at all, in Plaintiff's employment. Indeed, the evidence in the record suggests that this alleged lie lasted no more than one day. (*See* McClain Dep. at 139:15–140:3 (Plaintiff's supervisors "pulled a nasty joke on him and told him . . . that he failed probation" but "[a]s the day progressed, James [Norman] called him back in the office later and gave him his performance [review], and he had passed.").) And while Plaintiff testified that he "only received [his] probation report sometime by December 2011, two months after [his] probation date" (Joseph Dep. at 153:3–8), it appears undisputed that Plaintiff received his fourth and final probationary report on September 22, 2011—exactly one year from the start of Plaintiff's probationary period on September 23, 2010—and that report bears his and his supervisor's signatures, dated "9/22/11." (*See* Nabors Decl. Ex. D at ECF 5; *see also* Def. 56.1 ¶ 18.) There is no evidence in the record that these signatures were forged or backdated. While the conduct of Plaintiff's supervisors in playing a "nasty joke" on him may have been "unprofessional and boorish," that does not render it an adverse employment action. *Mathirampuzha*, 548 F.3d at 79 (only where single action is "so severe as to alter materially the plaintiff's working conditions" does it qualify as an adverse employment action). Therefore, Plaintiff's disparate treatment claim may not proceed on this basis.

\*\*\*

For the foregoing reasons, Defendant's motion for summary judgment as to Plaintiff's disparate treatment claim is DENIED, but Plaintiff will only be permitted to pursue this claim based on hostile work environment and the adverse employment actions of imposing on Plaintiff a disproportionate workload and transferring Plaintiff to Shirtz 2 after the December 2011 incident, where his already disproportionate workload increased.

## III.  Retaliation

The Court turns next to Plaintiff's retaliation claim.  A Title VII claim for retaliation is governed by the *McDonnell-Douglas* burden-shifting framework, discussed *supra*, and a plaintiff can establish his *prima facie* case by showing that (1) he participated in a protected activity, (2) the defendant knew of the protected activity, (3) plaintiff suffered an adverse employment action,[49] and (4) there was a causal connection between the adverse employment action and the protected activity.  *See Littlejohn*, 795 F.3d at 316; *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006).  "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be

---

[49] What constitutes an adverse employment action in the context of a Title VII retaliation claim is broader than under a Title VII discrimination claim; rather than requiring a plaintiff to demonstrate a material adverse change to the terms and conditions of his employment, as is required to establish a *prima facie* discrimination claim, a plaintiff claiming Title VII retaliation need only establish that he suffered "employer actions that would have been materially adverse to a reasonable employee or job applicant," *i.e.*, "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Hicks v. Baines* (*Baines*), 593 F.3d 159, 165 (2d Cir. 2010) (quotation marks omitted); *id.* (Title VII's anti-discrimination and anti-retaliation provisions "are not coterminous"—the anti-retaliation protection is broader and "extends beyond workplace-related or employment-related retaliatory acts and harm."); *see also Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (Title VII's anti-retaliation provision is not meant to impose a "general civility code for the American workplace," but instead to protect employees from those actions that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination.").

sufficiently 'substantial in gross' as to be actionable." *Baines*, 593 F.3d at 165 (citations omitted).

With respect to the causal connection element, a plaintiff asserting a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532–34 (2013) (standard for anti-retaliation claims is "but-for" causation, separate from "motivating factor" causation in anti-discrimination claims, because of "the particular interplay among the status-based discrimination provision (§ 2000e-2(a)), the anti-retaliation provision (§ 2000e-3(a)), and the motivating-factor provision (§ 2000e-2(m))"). This causal connection may be demonstrated either directly, through evidence of retaliatory animus directed against the plaintiff by the defendant, or indirectly, by showing that the protected activity was followed closely by discriminatory treatment. *See, e.g., Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Plaintiff alleges that he has established this causal connection purely by virtue of the temporal proximity between certain retaliatory actions, discussed *infra*, and his protected activity of complaining about the discriminatory conduct he suffered in the workplace. (*See* Pl. Opp. at ECF 24–25 n.15.)

A.   Instances of Protected Activity

As an initial matter, the Court concludes that only Plaintiff's April 2011 and December 2011 workplace violence complaints can form the basis of his retaliation claim here. *See, e.g., Ruiz v. City of N.Y.*, No. 14-CV-5231, 2015 U.S. Dist. LEXIS 117947, at *15 (S.D.N.Y. Sept. 2, 2015) ("A protected activity includes any action that 'protests or opposes statutorily prohibited discrimination,'" including "'[i]nformal complaints to supervisors . . . or filing a formal complaint'") (citations omitted).[50] Both the record and Plaintiff's opposition papers are devoid

---

[50] "Implicit in the requirement that the employer have been aware of the protected

of evidence or argument sufficient to sustain Plaintiff's retaliation claim as to any other alleged protected activity.

### 1.   Miscellaneous Complaints

For example, Plaintiff adduces testimony regarding complaints about discrimination with no reference to date and no link to any closely subsequent retaliatory act, such that no rational factfinder could find that the alleged protected activity was the "but-for" cause of the retaliation. (*See, e.g.,* Larrieux Dep. at 76:16–77:22 (testifying to "one incident" in which Plaintiff complained to supervisors about "being treated [poorly] because [Plaintiff was] Haitian," meaning he was "getting [an] extra heavy [work]load" and "being denied breaks," but no date attributed to complaint or subsequent retaliatory act); *id*. at 109:14–110:3 (Plaintiff would tell his supervisors that "because he is Haitian, they are calling him names and they are giving him extra [work] . . . [and] denying him breaks . . . , that he is being discriminated against," but his supervisors "would just laugh or not say nothing and just walk away").)

---

activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). It is undisputed that neither of Plaintiff's written workplace violence complaints in April or December 2011 contained allegations of national origin discrimination. (Def. 56.1 ¶¶ 23 (April 2011 complaint), 35 (December 2011 complaint).) But Plaintiff has adduced evidence demonstrating that he complained orally to his supervisors of national origin discrimination in April 2011. (*See* Joseph Dep. at 96:16–97:9, 98:14–19 (on April 21, 2011, Plaintiff told Nabors about Gilbert's anti-Haitian statement).) And Plaintiff has adduced evidence that Nabors heard the discriminatory remarks made by Gilbert during the December 2011 physical altercation (*id*. at 105:19–106:12), such that when Plaintiff filed his written workplace violence report, he "didn't really have to emphasize [those statements] . . . in the report," particularly because he "had already made it known to everybody . . . orally" (*id*. at 106:18–107:9). This is sufficient, at this stage and in light of Plaintiff's other allegations regarding his supervisors' knowledge of, and involvement in, the discriminatory conduct directed at Plaintiff, for Plaintiff to proceed with his retaliation claim on the basis of the December 2011 complaint.

### 2. November 2010 and September 2011 Complaints

Plaintiff has also adduced evidence that he complained about Gilbert's discriminatory comments on November 29, 2010. (*See* Joseph Dep. at 88:21–89:14.) But he has alleged no retaliatory act that followed closely in time from which a trier-of-fact could find for Plaintiff on his retaliation claim. The same is true of Plaintiff's September 2011 complaint to Williamson. While Plaintiff testified that he complained to Williamson in September 2011 regarding the entire history of discrimination he had faced while employed by Defendant (*see* Joseph Dep. at 225:22–226:24), he has adduced no evidence that Williamson herself engaged in any retaliatory acts thereafter, that she communicated Plaintiff's complaint to his supervisors or co-workers, such that Plaintiff could establish a causal connection between his complaint to her and any retaliatory act by them,[51] or, most importantly, that there was any allegedly retaliatory act by *any* actor employed by Defendant because of Plaintiff's September 2011 complaint to Williamson.

### 3. February and June 2012 Complaints

While Plaintiff's February 2, 2012 complaint to the IG's Office and June 25, 2012 EEOC charge could qualify as protected activities sufficient to form the basis of Plaintiff's retaliation claim, the only potential retaliatory activity occurring subsequent to either complaint was Plaintiff's termination in March 2014. Though it is undisputed that termination is an adverse employment action, Plaintiff has not established the requisite causal connection between his

---

[51] Indeed, Plaintiff's testimony indicates that Williamson did *not* communicate Plaintiff's complaint to any of the actors Plaintiff alleges retaliated against him. (*See* Joseph Dep. at 226:25–227:5 (Williamson did not do anything, including "confront[ing] [Plaintiff's] supervisors," to help Plaintiff).) *Cf. Gordon*, 232 F.3d at 117 (while a factfinder "can find retaliation even if the [retaliating] agent denies direct knowledge of a plaintiff's protected activities," it may do under limited circumstances, *i.e.*, "so long as the [factfinder] finds that the circumstances evidence knowledge of the protected activities or . . . concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge").

February and June 2012 protected activities and his March 2014 termination.

Plaintiff has pointed to no direct evidence of retaliation. Rather, Plaintiff relies entirely on indirect evidence of temporal proximity between his protected activity and the alleged adverse employment action of termination. (*See* Pl. Opp. at ECF 24 n.15 ("The causal connection requirement is satisfied by the temporal proximity between protected activity and the adverse employment action.").) But where "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" is presented as evidence of causal connection, a plaintiff's *prima facie* burden is met only if the "temporal proximity [is] 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). Plaintiff himself acknowledges this. (*See* Pl. Opp. at ECF 24 n.15 (citing, *inter alia*, *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) and *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998), for the proposition that the protected activity must be "*closely followed in time* by the adverse action") (emphasis added).) That Plaintiff was terminated two years after he left BDDSO to go on worker's compensation leave (Def. 56.1 ¶ 21) and almost two years after his last protected activity in June 2012 renders this evidence insufficient to establish the requisite causal connection and therefore to sustain Plaintiff's retaliation claim. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 127–28 (2d Cir. 2013) (collecting cases of causal connection being established by temporal proximity of three, six, and eight months).

B.    Retaliatory Acts[52]

Other than termination, which the Court has already addressed, *supra*,[53] Plaintiff asserts

the following retaliatory acts: (1) increased discriminatory treatment levied at Plaintiff, including

escalating verbal harassment, and supervisors allowing and inciting Gilbert to assault him; and

(2) blaming Plaintiff for being the initial aggressor in the interactions with Gilbert and

consequently transferring Plaintiff to different locations where his workload would increase. (*See*

Pl. Opp. at ECF 24–25.)

1.    Increase in Discriminatory Treatment

Given that the discriminatory treatment on which Plaintiff bases his retaliation claim is

the same conduct underlying his hostile work environment claim, the Court construes Plaintiff's

claim as one for retaliatory hostile work environment. To establish such a claim, "a plaintiff must

satisfy the same standard that is applied generally to hostile work environment claims regarding

the severity of the alleged conduct." *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 438

(E.D.N.Y. 2009). To establish a causal connection between the protected activity and the alleged

hostility, a plaintiff must demonstrate "'some increase in the discrimination or harassment—

---

[52] As with the adverse employment actions enumerated as the basis of Plaintiff's disparate treatment claim, the instances of retaliation Plaintiff enumerates overlap extensively—*i.e.*, "blaming [Plaintiff] for being the aggressor," "[t]ransferring [Plaintiff] to different locations on the grounds he was a troublemaker," and "[t]ransferring plaintiff to Shirtz 2 . . . after the 12/22/11 assault"—such that the Court has once again re-organized them into separate and distinct categories. (*See* Pl. Opp. at ECF 24–25.)

[53] Plaintiff also contends that Defendant's conduct "in essence, forced plaintiff out [and] Defendant has since terminated plaintiff's employment." (Pl. Opp. at ECF 25.) As discussed, *supra*, Plaintiff has failed to demonstrate the requisite causal connection between his last protected activity in June 2012 and his March 2014 termination. And to the extent Plaintiff argues that he was constructively discharged as a result of being forced to bear an increased workload in Shirtz 2, the Court views that claim as coterminous with the allegedly retaliatory transfer and increase in Plaintiff's workload following Plaintiff's December 2011 complaint, discussed *infra*.

either a 'ratcheting up' of the preexisting behavior, or new, additional forms of harassment[.]'" *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 244–45 (E.D.N.Y. 2015); *see also Hall v. N.Y.C. Dep't of Transp.*, 701 F. Supp. 2d 318, 339 (E.D.N.Y. 2010) (same). "If, however, 'the discrimination was just as bad before the employee complained as it was afterwards, then the employee's complaints cannot be said to have led to that discriminatory behavior.'" *Bacchus* at 245; *Hall* at 339. Moreover, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001) (finding plaintiff failed to establish an inference of retaliation where the adverse employment actions "were both part, and the ultimate product, of 'an extensive period of progressive discipline[]'").

Here, the testimony Plaintiff has proffered—both his own and his corroborating witnesses'—demonstrates that Plaintiff was already subjected to "daily" verbal harassment prior to both the April and December 2011 complaints, and Plaintiff has pointed to no evidence in the record demonstrating that Defendant "intensified and/or increased [the] hostile behavior toward [him]," or engaged in new forms of harassment, "immediately following the filing of [his] complaints." *See Bacchus*, 137 F. Supp. 3d at 245. For these reasons, a trier-of-fact would not be able to conclude that Plaintiff suffered an adverse employment action causally connected to either of the protected activities at issue here.

### 2. Response to Workplace Violence and Transfers

For largely the same reasons as discussed, *supra*, in the Court's analysis of Plaintiff's disparate treatment claim, Plaintiff has not established his *prima facie* case of retaliation with respect to his April 2011 complaint and subsequent transfer. There is insufficient evidence from

which a rational factfinder could conclude that the complained-of employer actions "would have been materially adverse to a reasonable employee," meaning "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.

However, again for much the same reasons as discussed in connection with Plaintiff's disparate treatment claim, he has established that his transfer to Shirtz 2 subsequent to his December 2011 complaint was an adverse employment action causally connected to Plaintiff's protected activity.

Plaintiff has proffered evidence that a transfer to Shirtz 2 constituted a material adverse change to the conditions of his employment, as Shirtz 2 had a "heavier [work]load" than in Defendant's other facilities, "because only one person works the whole building" and "[t]here is no help over there." (McClain Dep. at 142:16–143:7.) That the transfer occurred on January 4, 2012, less than a month after Plaintiff's December 22, 2011 complaint (Def. 56.1 ¶ 40), is sufficient to establish a causal connection based on temporal proximity. *See Feingold*, 366 F.3d at 156–57. Defendant does not offer any reason for the alleged retaliation, instead arguing that Plaintiff's allegations "belie his claim that he was retaliated against for any specific protected activity" and that Plaintiff has failed to establish an inference of discrimination, because his alleged "adverse job actions . . . began *before* his protected action." (Def. Mot. at 22–24.)

But to the extent Defendant relies upon the same reason for Plaintiff's December 2011 transfer (as opposed to the April 2011 transfer) that it used in response to Plaintiff's discrimination claim—namely that Plaintiff agreed to the transfer after "verbally threatening the other coworker" in front of Norman and a personnel department employee (*see* Def. Mot. at 18; Norman Decl. ¶ 17)—Plaintiff "has produced sufficient evidence for a reasonable trier-of-fact to conclude that

defendant['s] stated reason for [Plaintiff's] [transfer] was a pretext for unlawful discrimination." *See Feingold*, 366 F.3d at 157 (finding district court erred in granting defendant summary judgment on plaintiff's retaliation claim, because the same evidence permitting "a reasonable fact-finder [to] infer discriminatory motive" on the plaintiff's discrimination claim constituted "sufficient evidence for a reasonable trier-of-fact" to find pretext on the plaintiff's retaliation claim). To wit, Plaintiff has submitted evidence that Plaintiff's supervisors, Nabors and Norman, planned to transfer Plaintiff to Shirtz 2 after he complained of Gilbert's bias-motivated attack. (*See* McClain Dep. at 141:15–142:10 (after the December 2011 incident and Plaintiff's complaint thereon, Nabors and Norman discussed "put[ting] [Plaintiff] in Shirtz," because "[t]he fucking Haitian won't be able to do the job . . . He is either going to quit or we are going to have to fire him."*); see also id*. at 56:18–57:24 (in the same conversation, Nabors informed Norman that he had fixed the dryer so "'[n]obody is going to believe Jimmy,'" and when Norman asked what they were going to do with Plaintiff, Nabors allegedly responded, "'we can send him to Shirtz . . . Either he won't be able to do the work and he will quit or we have to fire him because he is not doing the work properly.'"); *id*. at 127:25–128:12 (same).)

For these reasons, a rational juror could find in Plaintiff's favor on his retaliation claim on the basis of his post-December 2011 transfer to Shirtz 2, and therefore Defendant's motion for summary judgment is denied as to that aspect of Plaintiff's retaliation claim.[54]

---

[54] Defendant is correct that there is record evidence indicating that Plaintiff suffered increases to his workload prior to his December 2011 complaint. (*See, e.g.*, Joseph Dep. at 73:2–74:3 (Plaintiff's workload "doubled" after the May 18, 2011 Haitian flag day incident).) While it is true that, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," *Slattery,* 248 F.3d at 95, that standard applies only where "timing is the only basis for a claim of retaliation," *id*. Here, Plaintiff has adduced sufficient direct and indirect evidence from which a rational factfinder could conclude Defendant had a discriminatory and/or retaliatory motivation for Plaintiff's post-December 2011 transfer to Shirtz 2, and that the increase to his workload resulting therefrom was

IV.     Failure to Promote

To establish a *prima facie* claim of discriminatory failure to promote, the Second Circuit requires a plaintiff to demonstrate that (1) he is a "member of a protected class," (2) he "applied for promotion to a position for which he was qualified," (3) he was "rejected for the position," and (4) the employer "kept the position open and continued to seek applicants." *See Mauro v. Southern New Eng. Telecomms., Inc.*, 208 F3d 384, 386 (2d Cir. 2000); *see also Tanvir v. N.Y.C. Health & Hosps. Corp.*, 480 F. App'x 620, 621 (2d Cir. 2014) (summary order) (same). Merely expressing an interest in a position is insufficient to sustain a discrimination claim based on a failure to promote. *See, e.g., Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004); *Sethi*, 12 F. Supp. 3d at 525–26. Rather, unless an employee can demonstrate that the job at issue was not posted and that he had no knowledge of the vacancy before it was filled or otherwise attempted to apply for it through informal procedures endorsed by the employer, the plaintiff must show that he actually applied for the position in question and was rejected—the so-called "specific application rule."

There is limited evidence in the record regarding the nature of the position Plaintiff allegedly sought, and no evidence at all regarding the qualifications for that position or whether Plaintiff met them. With respect to the position itself, Defendant asserts, and Plaintiff does not dispute, that a former employee named Courtney Rogers, who was the Adaptive Equipment Specialist in the Occupational Therapy Department at BDDSO, left BDDSO in January 2012. (Def. 56.1 ¶ 85.) Before his departure, Rogers showed Plaintiff what he would be required to know if he wanted to apply for Roger's position upon his departure. (*Id.* ¶ 86.) Defendant claims that Plaintiff was never part of a formal internship or training program with respect to this

---

of a different nature and/or magnitude than anything that had come before.

position, nor did he ever apply for the position; rather, the position was never posted. According to Defendant, BDDSO requested to fill the position twice—in December 2012 and May 2013— but it was never given permission to post or fill the position. (*Id.* ¶¶ 87–89.) Disputing this, Plaintiff cites to his own deposition testimony for the proposition that he applied for the posted position, and worked as an intern while that application was pending. (Pl. Opp. 56.1 ¶¶ 87–89 (citing Joseph Dep. at 134–38). *Cf.* Pl. Opp. at ECF 25 (citing Joseph Dep. at 131–38).[55]) This testimony is the sole evidence that Plaintiff adduces in support of his failure to promote claim.[56]

Plaintiff's testimony, however, is too inconclusive to establish even a *prima facie* case. Plaintiff testified that an unnamed employee of Defendant's "offered [Plaintiff] to move into her department, to transfer to a better position, from housekeeping," and that that individual "tried to

---

[55] While Plaintiff cites pages 131 through 138 of Plaintiff's deposition in support of his failure to promote claim, the Court's review of the testimony on page 131 reveals no allegations about any position for which Plaintiff applied, and the Court is unable to find pages 132 and 133 in the record. Rather, based on the Court's review, pages 134 through 138 of Plaintiff's deposition are the only evidence regarding Plaintiff's alleged application for, and denial of, the promotion. (*Cf.* Pl. Opp. 56.1 ¶¶ 87–89 (citing pages 134 through 138 in disputing Defendant's allegedly undisputed facts that Plaintiff never applied for promotion).)

[56] McClain and Larrieux also testified regarding Plaintiff's pursuit of a promotion, but the Court has not considered this testimony, as it is based on what those witnesses heard from Plaintiff, rather than on anything they themselves perceived, and is therefore impermissible hearsay testimony as submitted. *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") (quotation marks omitted); *Patterson v. Cty. of Oneida*, 375 F.3d 206, 222 (2d Cir. 2004) (where "testimony proffered by [plaintiff]" was "hearsay," it was "not competent evidence in opposition to summary judgment"). Moreover, even if the Court were to consider this testimony, it would not alter its conclusion, as the testimony in question provides even less information about the alleged position, its requirements, and Plaintiff's qualifications for the position than does Plaintiff's own testimony. (*See* McClain Dep. at 87:3–23 (Plaintiff was excited about "a position," he "put in a request for it," and after some time passed, he "didn't get the position"); Larrieux Dep. at 79:25–80:24 (though Larrieux did not know about Plaintiff's application to any promotion, Plaintiff told Larrieux that he was "supposed to get" a position in the occupational therapy department, Susan [presumably Alexander] "promised him that he was going to start," but he did not).)

get [Plaintiff] into a department into an internship program, so [Plaintiff] would get in a better position . . . where [his] pay level would have increased from grade five to a grade 14." (Joseph Dep. at 134:4–12.)[57] According to Plaintiff, he was interning in that department and worked there "every time [he] ha[d] a day off" (*id*. at 135:8–17). Plaintiff applied for the position "right after [he] passed probation," but not based on any posting of the position; rather, Rogers and Alexander told him about the position. (*Id*. at 136:10–13). Alexander told Plaintiff that Defendant was "supposed to post it up, and she wanted [Plaintiff] to get the position." (*Id*. at 136:14–23.) In other words, other than Plaintiff's vague testimony that he "applied for the position," the record is devoid of any evidence that the position in question was available, let alone that Plaintiff himself took affirmative steps to apply for it. Instead, it appears at most that Alexander herself, rather than Plaintiff, expressed Plaintiff's interest in the position to unnamed individuals in the housekeeping department, but was unable to secure the position for Plaintiff. (*See id*. at 137:3–13 (Alexander "told [Plaintiff] that she went, tried to get [his] item number to be released from housekeeping, and they were giving her a hard time"; she was "turned down twice" from going to meetings with Williamson and "no longer [thought] the position [wa]s going to be open for [Plaintiff]").)

This incoherent testimony is insufficient to satisfy the specific application rule and establish Plaintiff's *prima facie* case. *See Petrosino*, 385 F.3d at 227 (purpose of specific application rule is to "ensure that the fact finder is not left to speculate as to the qualifications of

---

[57] It appears this unnamed employee may have been either Courtney Rogers or a woman named Susan Alexander, Defendant's Senior Occupational Therapist (Alexander Decl. ¶ 2). (*See* Joseph Dep. at 136:4–23 (testifying that Rogers used to work in the position in question and that Plaintiff "didn't get the posting," but rather, "Courtney Rogers herself and Susan [Alexander] told [Plaintiff] about the position").)

All citations to "Alexander Decl." refer to the Declaration of Susan Forbes-Alexander in support of Defendant's motion for summary judgment. (Dkt. 98.)

the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them . . ., etc." and to "protect[] employers from the unfair burden of having to keep track of all employees who have generally expressed an interest in promotion"); *Sethi*, 12 F. Supp. 3d at 526–27 (plaintiff did not establish *prima facie* case of failure to promote where evidence established only that plaintiff "expressed an interest in the position in a series of email communications" but then could not recall if he responded to an email from a manager regarding the qualifications required for the position).

Even if the Court found that Plaintiff had applied for the position in question, this claim would still have to be dismissed, as Plaintiff has failed to establish that he was qualified for the position in question; indeed, there is *no* evidence in the record regarding the necessary qualifications for the position in question and whether Plaintiff met them. And finally, contrary to establishing the final element that Defendant kept the position open and continued to seek applicants, Plaintiff's own testimony reveals that the position was taken down and remained unfilled, even after he was allegedly rejected. (*See id*. at 134:24–135:2 ("That department is kind of halfway closed now."); *id*. at 136:24–137:2 (Alexander told Plaintiff "that the position was not going to be filled"); *id*. at 138:10–13 ("Susan Alexander told [Plaintiff] the position was removed" after Plaintiff applied).)

For these reasons, the Court grants Defendant's summary judgment motion as to Plaintiff's failure to promote claim.

## *CONCLUSION*

For the reasons stated above, Defendant's motion for summary judgment on Plaintiff's Title VII claims of hostile work environment, disparate treatment, retaliation, and failure to

promote is GRANTED IN PART and DENIED IN PART. The parties shall proceed to trial only on Plaintiff's hostile work environment, disparate treatment, and retaliation claims, as limited by this Order—and not on Plaintiff's failure to promote claim—and shall file a proposed joint pre-trial conference order no later than ninety (90) days from the date of this Order.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: September 30, 2016
       Brooklyn, New York